**UNITED STATES of America**

v.

**Aaron R. MOORE, Jr., Appellant.**

**UNITED STATES of America**

v.

**Robert DAVIS, Appellant.**

**Nos. 74–1788, 74–1792.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1975.

Decided May 27, 1975.

Rehearing and Rehearing En Banc Denied July 28, 1975.

Francis X. Grossi, Jr., Washington, D. C., with whom Robert P. Watkins, Washington, D. C., was on the brief, for appellant Moore.

Glenn R. Graves, Washington, D. C., for appellant Davis.

David E. Wilson, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, E. Lawrence Barcella, Jr., and William J. Hardy, Asst. U. S. Attys., were on the brief, for appellee.

Before FAHY, Senior Circuit Judge, and WRIGHT and ROBINSON, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

Appellants Aaron Moore and Robert Davis seek reversal of their convictions for operation of an illegal interstate gambling enterprise on the basis of the District Court's failure to suppress certain court-authorized electronic surveillance evidence and its fruits, allegedly obtained in violation of the District of Columbia version of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1970), the statute regulating acquisition and use of such electronic surveillance evidence.[1] We reverse the conviction of

---

1. 18 U.S.C. § 2516(2) permits states (which includes the District of Columbia under 18 U.S.C. § 2510(3)) to enact wiretap statutes covering certain local crimes, although the

appellant Moore because Government investigators who had probable cause to believe he was implicated in the gambling conspiracy and would be utilizing the target telephone erred in not naming him as a person "known" to be using that telephone in an application for a wiretap order. We affirm the conviction of appellant Davis, however, because all evidence relating to him was obtained in conformity with relevant statutory requirements.

### I

On September 19, 1973 appellants Moore and Davis were named along with two other individuals in a nine-count indictment alleging a variety of federal and District of Columbia Code gambling offenses. The indictment was the culmination of a four-month gambling investigation conducted jointly by agents of the Federal Bureau of Investigation and the Metropolitan Police Department, an investigation which employed five successive "pen registers"[2] and two wiretaps, all of which were installed pursuant to court orders.

Utilizing information supplied by confidential sources, Government investigators had been able to identify the individual who, by means of a telephone call from the Laurel, Maryland racetrack, provided the "numbers" service[3] to Washington, D. C. gamblers, and physical surveillance verified that he was calling two telephone numbers located at 5054 12th Street, N. E., immediately after completion of certain races at that track. An affidavit setting out this and other information formed the basis of an order issued by United States District Judge Hart on December 12, 1972, authorizing attachment of a pen register to those telephones, which were subscribed to by Augusta M. Medley and Leona McDaniel.[4] On January 29, 1973, a second pen register for those same telephones was installed pursuant to an order of Chief Judge Greene of the Superior Court of the District of Columbia.[5] These pen registers provided over 150 different telephone numbers which were called during the period the registers were in operation, and revealed an inordinate quantity of calls to telephones situated at 2312 Good Hope Road, S. E., subscribed to by Alton W. Dempsey, and at 1232 16th Street, N. E., subscribed to by Thomas M. Alston, Sr. In light of the volume and timing of these calls, the investigators sought and obtained ap-

---

state statutes must at a minimum conform to the procedural strictures of 18 U.S.C. § 2518. When Congress promulgated the District of Columbia Court Reform and Criminal Procedure Act of 1970, 84 Stat. 473 *et seq.*, it prescribed a wiretap statute for the District of Columbia, *see id.* at 616 *et seq.* (codified as 23 D.C.Code § 541 *et seq.* (1973)), that serves the same policies as and substantially parallels the federal statute. *See, e. g.*, H.R.Rep.No.1303, 91st Cong., 2d Sess. 237–239 (1970) (conference report); S.Rep.No.538, 91st Cong., 1st Sess. 18–25 (1969); Statement of the Managers on the Part of the Senate Submitted Regarding the Conference Action Upon S. 2601, The President's Crime Legislation for the District of Columbia, 91st Cong., 2d Sess. 29–30 (Committee on the District of Columbia Print 1970).

**2.** A pen register is a mechanical device attached to a given telephone line and usually installed at a central telephone facility. It records on a paper tape all numbers dialed from that line. It does not identify the telephone numbers from which incoming calls originated, nor does it reveal whether any

call, either incoming or outgoing, was completed. Its use does not involve any monitoring of telephone conversations. The mechanical complexities of a pen register are explicated in * * * [United States v. Focarile,] 340 F.Supp. 1033, 1038–1041 (Md. 1972).

United States v. Giordano, 416 U.S. 505, 549 n. 1, 94 S.Ct. 1820, 1842, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part). *See also id.* at 553–554, 94 S.Ct. 1820 (discussing the question of the applicability of the federal wiretap statute to pen registers).

**3.** *See* note 7 *infra.*

**4.** The order authorized agents of the FBI to operate the pen register for a period of 30 days, except Sundays, between 2:00 p.m. and 6:00 p.m., and to disclose the results to the Metropolitan Police Department.

**5.** The order authorized officers of the Metropolitan Police Department to operate the pen register for a period of 30 days, except Sundays, between 10:00 a.m. and 8:00 p.m., and to disclose the results to the FBI.

proval from Judge Hart on February 9, 1973, to install a pen register at the Good Hope Road location.[6]

In an affidavit alleging that the three pen registers reflected a pattern of telephone calls which, together with information supplied by confidential sources, established probable cause to believe the 12th Street location was the situs of an illegal gambling office, the investigators sought authorization from Chief Judge Greene on February 26, 1973, to install a wiretap at that location.[7] That request was approved by Judge Greene, who determined that there was in fact

probable cause to believe that Leona McDaniel, and others as yet unknown have committed and are committing offenses involving the placing and accepting of bets and wagers and otherwise managing, carrying on and promoting a lottery commonly known as the "numbers game," in violation of Section 1501 of Title 22, District of Columbia Code, the maintaining of a gambling premises in violation of Section 1505 of Title 22, District of Columbia Code, and are conspiring to commit such offenses in violation of Section 105a of Title 22, District of Columbia Code.[8]

6. The order was issued on the same conditions as the earlier order promulgated by Chief Judge Greene. *See* note 5 *supra.*

7. The affidavit elaborated on the nature of a "numbers" operation and the reasons why extended surveillance is necessary in the investigation of such cases:

> A numbers operation usually involves a person who collects the bets from the bettor or bettors, the "book." The "book," in turn, passes these bets to another person, the "backer," either in person or usually via telephone. It is the "backer" who subsequently pays the winning bettors. * * *
>
> If the "backer" has too many bettors placing bets on one specific number and/or numbers and such number and/or numbers were winners, the "backer" would lose much money. To avoid such extreme losses, the "backer" will transfer such bets to another person, known as the "lay-off man." Then if the heavily bet number should win, that man pays the winning bets. * * *
>
> * * * * * *
>
> A numbers operation involves either a one digit number and/or a combination of two digits and/or a combination of a three digit number, which is designated the "winning number" for a certain day. A number's bettor may bet on the first digit of a three digit number and/or on any combination up to and including the three digit number.
>
> The winning number is determined by ascertaining the results of certain horse races at a specific horse race track. * * * The totals of the Fifth race's win, place and show results are determined and the number to the left of the decimal point becomes the first digit. Same method is used regarding the Seventh and Ninth races to determine the second and third digits respectively. An individual at the race track will normally leave the track immediately following each of the above-mentioned races and telephone

a central office, known as the "service" as each digit is obtained. The "service" office will then call a number of large "layoff" offices informing each of the digit. * * * [I]t is common for a "service" to provide such information to more than one major "layoff" gambling office, and these gambling offices will then normally inform each of their major "books," who function as on-the-street collectors of "numbers" bets.

> * * * * * *
>
> The over-all purpose of interception of telephone communications in a gambling operation is not merely to develop evidence through arrest and search of a person and/or persons in one gambling office, but to obtain information about the entire gambling operations, including the gambling office operators, the backers, the layoff men and others who would be responsible for managing, supervising, directing, or owning all or part of this gambling operation or any other gambling operation which lays off bets with the instant operation.

Brief and appendix for appellee at 37–38, 43.

8. Application of the United States of America in the Matter of an Order Authorizing the Interception of Wire Communications at 1 (order filed Feb. 26, 1973). The affidavit requesting the court authorization specified that "there is probable cause to believe Mrs. Leona McDaniel and others as yet unknown" have committed and are committing the specified gambling offenses, while the court order authorized the Metropolitan Police Department to "intercept wire communications of Leona McDaniel and others as yet unknown" concerning those offenses. The police were authorized to operate the wiretap between the hours of 10:00 a.m. and 8:00 p.m., except Sundays,

> until communications are intercepted which reveal the manner in which Leona McDaniel and others as yet unknown participate in the use of telephone facilities for the placing and

On March 8 the investigators obtained approval from United States District Judge William Jones to install a pen register on the telephones at the 16th Street location, and on March 27 Acting Chief Judge Belson of the Superior Court authorized installation of a wiretap on those telephones. Both the affidavit seeking that wiretap and the judge's order specified that

> there is probable cause to believe that Thomas M. Alston, Robert Davis, Roger John Johnson, Leona F. McDaniel, Augusta M. Medley, and others as yet unknown have committed and are committing [specified gambling] offenses[.] [9]

Two days later, on March 29, Judge Belson approved attachment of a pen register to the telephones located at 2610 Bowen Road, S. E., which were subscribed to by appellant Moore. In authorizing that installation, Judge Belson found that

> [t]here is probable cause to believe that Aaron R. Moore, Thomas M. Alston, Robert Davis, Leona F. McDaniel, Augusta M. Medley, and other individuals using [the Bowen Road] telephones * * * are committing and are about to commit [specified gambling] offenses[.] [10]

On April 16, 1973, the investigators, relying on information obtained from the electronic surveillance as well as from confidential sources and other physical surveillance to support their allegations of probable cause, applied for search and arrest warrants for each appellant.[11] Execution of those warrants produced a substantial amount of gambling paraphernalia and records.[12] Prior to trial appellants moved to suppress this evidence on the ground that the warrants which resulted in its discovery were the tainted fruit of electronic surveillance which had been illegally implemented without proper compliance with certain statutory safeguards.[13] After Judge Waddy denied appellants' motions, each appellant waived his right to jury trial and was found guilty of operating an illegal gambling business, in violation of 18 U.S.C. § 1955 (1970),[14] in separate trials at which the prosecution and defense stipulated to the evidence. These appeals challenging the District Court's rulings on the pretrial motions followed imposition of a three-year suspended sentence and five years probation on each appellant.

## II

 Authorization for each wiretap involved in this case was obtained under

accepting of bets and wagers and otherwise managing, carrying on and promoting of a lottery commonly known as the "numbers game", and which reveal the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of twenty (20) days from the date of this order, whichever is earlier.
*Id.* at 3. Judge Greene also explicitly authorized the Metropolitan Police "to disclose to agents of the Federal Bureau of Investigation the contents of the wire communications" intercepted. *Id.* at 4.

9. *See* appendix for appellant Moore at 54a, 56a, 81a, 83a. Judge Belson authorized the Metropolitan Police to operate the wiretap for a maximum of 15 days, except Sundays, from the hours of 10:00 a.m. to 8:00 p.m., and explicitly approved disclosure to the FBI of the contents of the intercepted communications. The authorization specified that the investigators could only "intercept wire communications of Thomas M. Alston, Robert Davis, Roger John Johnson, Leona F. McDaniel, Augusta M. Medley and others as yet unknown * *." *Id.* at 83a.

10. *See* appendix for appellant Moore at 50a.

11. No claim has been made that there was not in fact probable cause to install any of the surveillance devices in this case. Appellant Moore does challenge the sufficiency of the information on which the search and arrest warrants were issued, but in light of our disposition of his alternative claims, we need not address that question.

12. Thirty-two individuals were also arrested pursuant to warrants charging them with local and federal gambling offenses.

13. *See also* note 55 *infra.*

14. The remaining counts of the indictment were dismissed as to both appellants.

the District of Columbia electronic surveillance statute, 23 D.C.Code § 541 *et seq.* (1973), one provision of which specifies that an application for a wiretap order shall include

> the identity of the person, if known, who committed, is committing, or is about to commit the offense and whose communications are to be or were intercepted[.]

23 D.C.Code § 547(a)(2)(D).[15] Patterned after 18 U.S.C. § 2518(1)(b)(iv), the analogous provision of the federal electronic surveillance statute, 23 D.C.Code § 547(a)(2)(D) was fashioned to satisfy the Fourth Amendment's particularity standard as enunciated in the wiretapping context by the Supreme Court in Berger v. New York, 388 U.S. 41, 58–60, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and Katz v. United States, 389 U.S. 347, 354–356, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).[16] Appellant Davis asserts that at the time the Government applied for authorization to conduct the 12th Street wiretap he was a "known" person within the meaning of 23 D.C.Code § 547(a)(2)(D), and that the Government's failure to name him in that application renders the surveillance illegal

and the fruits obtained therefrom inadmissible [17] against him. Appellant Moore raises a similar claim concerning the 16th Street wiretap.

■ Our interpretation of the requirement that "known" individuals be named in a wiretap application under the D.C.Code is guided by the Supreme Court's recent construction of the federal wiretap statute's essentially identical [18] particularity language. In United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), Government investigators applied for court authorization to intercept conversations over the home telephones of Mr. Kahn, a suspected bookmaker. The judicial order approving the surveillance restricted the interception to the conversations of Mr. Kahn, who had been named in the affidavit requesting the authorization, and "others as yet unknown." Incriminating conversations of Mrs. Kahn were intercepted, and the Kahns sought suppression of those conversations in their prosecution for violation of the Travel Act, 18 U.S.C. § 1952 (1970), basing their motion on the premise that the interceptions were illegal, Mrs. Kahn having been neither named in the order nor a

---

**15.** The court order authorizing a wiretap must also specify "the identity of the person, if known, or otherwise a particular description of the person, if known, whose communications are to be or were intercepted[.]" 23 D.C.Code § 547(e)(1). This provision does not, however, increase in any way the Government's obligation to identify "known" individuals in its wiretap applications. *Cf.* United States v. Kahn, 415 U.S. 143, 152, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

**16.** *See* S.Rep.No.1097, 90th Cong., 2d Sess. 74–75, 101 (1968); sources cited note 1 *supra*.

**17.** Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States or the District of Columbia, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(1) the communication was unlawfully intercepted[.]

23 D.C.Code § 551(b). According to 23 D.C. Code § 541(9), an "aggrieved person" is a person "who was a party to any intercepted wire

or oral communication or a person against whom the interception was directed." Since the gambling paraphernalia which constituted the evidence concerning a violation of 18 U.S.C. § 1955 were obtained solely through execution of search and arrest warrants predicated in part on conversations intercepted through the court-ordered surveillance, a finding that the surveillance was illegal would mandate suppression of the warrants and evidence acquired pursuant to their execution as the tainted product of that surveillance. *See also* note 33 *infra*.

**18.** 18 U.S.C. § 2518(1)(b)(iv) requires that an application under the federal wiretap statute specify "the identity of the person, if known, committing the offense and whose communications are to be intercepted." The main operative language of this provision is identical with that of the D.C.Code provision quoted in text; the only difference results from the fact that the federal provision is operative only for those "committing" the offense, while the D.C. provision has broader applicability to any individual "who committed, is committing, or is about to commit" the offense.

person "as yet unknown" within the meaning of the authorization. Although the Supreme Court reversed the suppression order of the District Court and the Court of Appeals because those courts, in holding Mrs. Kahn to be a "known" individual who should have been named in the wiretap application and order, had construed the relevant statutory language as encompassing any individual whose existence was known to the Government and who careful investigation would have disclosed was probably in complicity in the illegal activities forming the basis for the surveillance, it observed:

> Title III requires the naming of a person in the application or interception

order only when the law enforcement authorities have probable cause to believe that the individual is "committing the offense" for which the wiretap is sought.[19]

Thus, when an individual's complicity in the crimes being investigated and likely use of the target telephones is "discoverable," he is not "known" within the meaning of the particularity standard, but once the Government possesses probable cause to suspect such complicity and use, the individual is "known" within the statutory language and must be brought to the attention of the judge ruling on the wiretap request.[20] *See* United States v. Bernstein, 4 Cir., 509 F.2d 996, 1001–1002 (1975).[21]

19. 415 U.S. at 155, 94 S.Ct. at 978 (dictum). The suppression order was reversed because the Government had not possessed probable cause to believe Mrs. Kahn was involved in her husband's criminal activities. *See id.*

20. The Government in this case does not deny that in seeking wiretap authorization under 23 D.C.Code § 547(a)(2)(D) it must similarly list all persons who it had probable cause to believe were using the target telephones to commit the specified offenses at the time authorization was sought. *See* brief and appendix for appellee at 7 n. 16 ("[t]he question to be answered in resolving the issue raised by appellant Davis is thus whether the Government had 'probable cause' as to him at the time of the 12th Street wiretap application"); *id.* at 13 ("the question [is] whether the government had probable cause to include [Moore] in its application for the 16th Street location wiretap"). However, at one point in its brief the Government appears to argue that the test for probable cause is a subjective rather than an objective one:

> As appellant Moore states in his brief, the critical question is whether "the government believed that there was probable cause as to these matters" * * *. We would agree with appellant's statement as to the analysis which the Government was required to make, and respectfully submit that the Government acted entirely in good faith in not so naming him in its March 28 application for the wiretap at the 16th Street location.

*Id.* at 17 (footnote omitted). We must unequivocally reject this contention and reaffirm the principle that in assessing the existence *vel non* of probable cause, a court must determine the *objective* facts available to the police department as a *collective* entity. *See, e. g.,*

United States v. Jenkins, 2 Cir., 496 F.2d 57, 72–73 (1974); United States v. Stratton, 8 Cir., 453 F.2d 36, 37, *cert. denied,* 405 U.S. 1069, 92 S.Ct. 1515, 31 L.Ed.2d 800 (1972); Smith v. United States, 123 U.S.App.D.C. 202, 205, 358 F.2d 833, 835 (1966), *cert. denied,* 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967).

21. United States v. Martinez, 6 Cir., 498 F.2d 464 (1974), upheld the conviction of an individual who was not named in the wiretap application and order but whose "identity was known to the FBI prior to the time that the authorization was sought." *Id.* at 468. However, although "something was known of [the individual's] contacts with the only person named in the [wiretap] application," *id., Martinez* does not stand for the proposition that the Government need only name an individual in an application when it possesses *more* than just probable cause. Rather, it supports the theory that the Government must possess probable cause to believe not only that the individual is committing the offenses under investigation, but also that the individual will be intercepted over the target telephone:

> The term "as yet unknown" may properly be applied to *persons whose identity is known, but who the government has no probable cause to believe are involved in illegal use of communication facilities.* Although Martinez [the unnamed individual] was known as an acquaintance of Vara [who was named in the application and order], his role in the interstate transmission of forbidden gambling information was first discovered by the interception of calls over the Vara telephone. Under these circumstances, he was not entitled to have the evidence suppressed for failure to name him in the application and order.

*Id.* (emphasis added). *See also* note 31 *infra.*

## A.

Appellant Moore contends that the illegality of the Government's failure to name him in the March 27th (16th Street) wiretap application and order is unambiguously established by the fact that the Government's practically contemporaneous March 29th application for a pen register on the Bowen Road telephones registered in his name revealed that before March 27 the Government both knew of Moore and had probable cause to believe he was a principal involved in the gambling offenses under investigation at both locations. We agree with Moore and find that the Government's failure to so name him compels a reversal of his conviction.

The affidavit which the Government investigators submitted on March 29 in support of the pen register to be placed on phones subscribed to by appellant Moore disclosed considerable data available to the Government prior to installation of the 16th Street wiretap a mere two days earlier. First, the pen register installed at the 16th Street location on March 8 indicated that the 16th Street office was an even larger gambling office than the one at the 12th Street location, and that the 16th Street situs was used for disseminating the "number" to layoff offices [22] immediately after completion of certain races at the local track; one of the Bowen Road phones subscribed to by appellant Moore was the first number called from the 16th Street office in each series of calls after completion of a race, and was thus considered by the investigators to be the most important gambling-related number called from that office.[23] Second, Metropolitan Police Department and FBI records disclosed that appellant Moore uses the nickname "Monk," [24] and a pu-

tatively reliable confidential source on March 8 had

> advised that Algernon Tucker, who was supposedly a close friend of [then recently deceased] Ray Myles [a major D.C. numbers gambling backer], is now trying to direct some of the numbers work of Myles to an individual known as Monk. Monk handles numbers work and narcotics for Tucker.[25]

Third, a second confidential source on March 8 had

> advised that Algernon Tucker was steering most of the Myles' numbers work to Aaron "Monk" Moore. [The source] estimated that Moore had over $4,000 per day of Myles' work as of March 8, 1973. Moore stays with his mother at 724 Girard, N.W., or with his girlfriend Aretha Noble (phonetic) in the 2600 block of Bowen Road, S.E. Noble's apartment is used as a numbers office.[26]

Fourth, on March 14 a third confidential source had "advised that Aaron 'Monk' Moore is a 'rising star' and up-and-coming WDC underworld gambling-narcotics figure." [27] Fifth, still another allegedly reliable informant had disclosed to the investigators on March 19

> that Monk Moore owns real estate on 9th Street, N.W., WDC, and is active in numbers. Moore's numbers work is related to the Myles organization.[28]

Indeed, the Government alleged in its March 29th affidavit that these data constituted "sufficient probable cause to believe that Thomas M. Alston, Robert Davis, Leona F. McDaniel, Augusta M. Medley, Aaron R. Moore, and others as yet unknown have committed and are committing [specified gambling] offenses," [29] and it was clear from the affi-

---

22. *See* note 7 *supra.*

23. Appendix for appellant Moore at 30a (affidavit of FBI Special Agent Meyers and Metropolitan Police Department Plainclothes Officer Budai in support of request for order permitting attachment of pen register device on Bowen Road telephones).

24. *Id.* at 31a.

25. *Id.* at 33a.

26. *Id.*

27. *Id.* at 32a.

28. *Id.*

29. *Id.* at 18a.

davit that these were the same offenses which were the subject of the 16th Street wiretap installed two days earlier.

◼ We agree with the conclusion, expressed by Judge Belson in his March 29th order permitting the pen register, that these facts clearly established "probable cause" to believe appellant Moore was engaged in the offenses which the police were investigating through the 16th Street wiretap.[30] Since the investigators also had probable cause to believe Moore would be overheard in conversations transpiring between the 16th Street and Bowen Road telephones,[31] he was therefore a person "known" to be committing criminal offenses within the meaning of 23 D.C. Code § 547(a)(2)(D).[32] Because Moore

---

**30.** *See id.* at 50a; *supra,* 168 U.S.App.D.C. at ——, 513 F.2d 492.

**31.** The Bowen Road situs was inhabited not only by appellant Moore, but also by Retha Pierce Noble, a secretary employed by the United States Attorney's office. The Government contends that the fact that the telephones at that address were subscribed to by Moore is thus not "conclusive in establishing his personal use of them for gambling purposes." Brief and appendix for appellee at 19 n.38. Rather, the Government claims it "had no way of knowing whether the telephone calls were in fact going to appellant or to the woman who shared the residence with him." *Id.* at 18–19. However, it is clear that of the two residents, only appellant Moore was suspected of using the Bowen Road telephones for gambling purposes. Although the affidavit for the pen register on those telephones indicated police knowledge that Moore and Noble dwelled together, *see* appendix for appellant Moore at 23a, 32a–33a, the affidavit did not specify Noble as an individual who the police suspected was implicated in the gambling offenses. Indeed, the independent confidential informant data focused solely on Moore as the individual engaged in numbers activities; in addition to establishing probable cause to believe Moore was engaged in that criminal activity, it established him as the likely recipient of the telephone calls transpiring between the 16th Street location (where the wiretap in question was installed) and the Bowen Road telephones. It is irrelevant whether the data made this presumption "conclusive," since the standard for naming an individual in the application and order is "probable cause," not "conclusiveness."

Similarly, the Government asserts that its failure to name Moore is excusable because "the Government in the instant case pursued a policy of seeking wiretaps as to particular individuals only when it had absolutely no question as to the existence of probable cause." Brief for appellee at 18. Nevertheless this policy, which purportedly is designed to protect the privacy interests of potential subjects of electronic surveillance, did not prevent Moore's conversations from being intercepted. Although the Government might wish to pursue the salutary policy of refraining from wire-

tapping unless it has more than sufficient grounds to believe the surveillance will produce evidence of criminal activity, it cannot avoid compliance with statutory requirements with respect to surveillance which it in fact initiates. As discussed previously in text, the particularity standard embodied in 23 D.C. Code § 547(a)(2)(D) requires that the Government's application must specify and the court order must name *all* individuals who the Government has probable cause to believe are engaged in the criminal activities under investigation and whose conversations are likely to be intercepted over the target telephones; even if the Government follows a policy of restraint in deciding whether to conduct such surveillance, we are not free to condone any relaxation of congressionally mandated statutory strictures once such a decision is made. *See also* notes 32 & 34 *infra.* Should the Government be concerned about the possibility that in marginal cases a court might *ex post facto* determine that there was probable cause to name additional individuals in a wiretap application, it can protect itself by presenting the facts concerning such marginal cases to the judge issuing the wiretap order. Such an approach, unlike the Government's supposedly ascetic policy of naming only those individuals concerning whom "it had absolutely no question as to probable cause," will better effectuate the statutory intent that individual rights be protected even in situations in which surveillance will be installed in any event.

**32.** We wholeheartedly concur in the Government's pronouncement that the existence of probable cause to install a pen register on the Bowen Road telephones would not necessarily establish probable cause to intercept Moore's conversations through a wiretap on the 16th Street telephones. *See* brief and appendix for appellee at 14. However, particularly in light of the fact that other evidence supported installation of the 16th Street wiretap, we find that the evidence enumerated in the application for the Bowen Road pen register was more than sufficient to require Moore's being named as a "known" individual in the 16th Street application and order. Indeed, the allegations of the affidavit supporting the Bowen Road pen register application might have been sufficient to support a wiretap even on the

was neither named in the affidavit seeking authorization for the 16th Street wiretap nor specified in the judicial order under which it was installed, the surveillance was illegal with respect to him [33] and the evidence produced through execution of a warrant issued partially in reliance on information derived from that surveillance must be suppressed as the illegal fruit of the poisonous tree.[34] Moore's gambling conviction, which was predicated upon that illegally obtained evidence, must therefore be reversed.

▆▆▆ In reaching this holding, we are cognizant of the Government's argument that "Moore's name surfaced quite late in the electronic surveillance portion of the investigation" and that it was "exactly [at the time the pen register

was applied for] that investigators began to learn of Moore's possible connection" with the gambling organization being investigated.[35] However, as the description of the data in the hands of the Government *before* the 16th Street wiretap application was filed indicates, "probable cause" was established with respect to Moore's complicity in the gambling operations and likely use of the target telephones, and although this probable cause was established relatively shortly before the wiretap application was filed, it still necessitated the Government's naming of Moore as a "known" subject of the proposed surveillance. We recognize that omission of Moore's name may have been inadvertent, but there is no good faith defense to a failure to comply with the mandate of 23 D.C.Code § 547(a)(2)(D), a provision

Bowen Road telephones. In any event, since 23 D.C.Code §§ 547(a)(3) & (c)(3) require that investigative procedures short of wiretapping must be exhausted or shown to be unlikely of success before a wiretap installation may be approved, the fact that the investigation proceeded through the less intrusive pen register on the Bowen Road telephones has no probative value with respect to statutory requirements concerning the 16th Street telephones, where a wiretap was installed after other investigative techniques, including pen registers, had already been employed.

33. Since appellant Davis has not claimed that his conviction should be overturned because of any Government impropriety concerning the 16th Street surveillance, and since *Kahn* appears to support the proposition that there was only a statutory rather than a constitutional violation under the circumstances of this case, *see* 415 U.S. at 155 & n.15, 94 S.Ct. 977, we do not address the question whether appellant Davis and others overheard through the 16th Street wiretap could predicate challenges to the use of those conversations on the fact that they were illegal because of the failure to name appellant Moore in the application and order. *Cf.* United States v. Bellosi, 163 U.S. App.D.C. 273, 281–282, 501 F.2d 833, 841–842 (1974); note 17 *supra*. *See also* Rules 41(e) & 52, Fed.R.Crim.P. Nor do we address the question whether, even if such individuals would have standing to premise a challenge on these grounds, we could evaluate whether the wiretap order would still have issued and therefore treat this statutory violation as harmless error with respect to all individuals other than Moore. *See, e. g.,* H.R.Rep.No. 1303, *supra* note 1, at 238.

34. The recent. opinion of the Fourth Circuit in United States v. Bernstein, 509 F.2d 996 (1975), persuades us that suppression of evidence is the appropriate remedy when the Government illegally fails to name a "known" individual in the application for a wiretap that eventually results in acquisition of that evidence. In concluding that such a failure is a "material" violation of a statutory provision that was to be a "precondition[] to obtaining * * * intercept authority" rather than one that does not "affect the fulfillment of any of the reviewing or approval functions required by Congress," *compare* United States v. Giordano, *supra* note 2, 416 U.S. at 515, 94 S.Ct. at 1826, *with* United States v. Chavez, 416 U.S. 562, 575, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), the *Bernstein* court found that "the Act's identification requirements form an integral part of the system Congress created to protect privacy by executive and judicial control of electronic surveillance," 509 F.2d at 1001; they are important in guiding the Attorney General's decision to approve a proposed surveillance under 18 U.S.C. § 2516(1), in providing the judge issuing the wiretap order complete information concerning prior electronic surveillance under 18 U.S.C. § 2518(1)(e), and in guaranteeing notice to the overheard individual pursuant to 18 U.S.C. § 2518(8)(d), thereby facilitating post-interception judicial review. We believe the analogous particularity requirement of the D.C.Code similarly materially furthers the analogous executive and judicial review functions under the District's wiretapping statute. *Compare* 18 U.S.C. §§ 2516(1), 2518(1)(e), 2518(8)(d), *with* 23 D.C.Code §§ 546(a), 547(a)(5), 550(a).

35. Brief and appendix for appellee at 16.

which is an integral component [36] of the statutory scheme for court-authorized electronic surveillance. *See, e. g.,* United States v. Giordano, 416 U.S. 505, 524–529 & nn. 15 & 18, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).[37]

### B.

Appellant Robert Davis, who was named in the March 27th (16th Street) wiretap application and order, argues that he was "known" within the comprehension of 23 D.C.Code § 547(a)(2)(D) as early as the time of the February 26th (12th Street) wiretap application and order, in which he was not named. The validity of this contention turns upon whether the information available to Government investigators on February 26 was sufficient to establish probable cause to believe Davis was implicated in the gambling offenses being investigated and was likely to be intercepted over the target telephones.

From the initial pen register on the 12th Street telephones, the Government investigators had obtained over 150 different telephone numbers called during its period of operation. Pursuant to subpoenas *duces tecum* issued on December 15 and 19, 1972, the investigators learned the identities and addresses of 42 subscribers called more than once from the 12th Street telephones, including seven individuals who had gambling arrest records.[38] Although appellant Davis had such a record, he was not listed among the seven, indicating that he was called, if at all, only once during this period. However, calls to Davis' home telephone were certainly revealed by either the second 12th Street (January 23rd) pen register or the February 9th (Good Hope Road) pen register, since the telephone company's response to a subpoena *duces tecum* issued February 22, 1973 specified Davis' full name and his Hyattsville, Maryland home address as the subscriber and location of a telephone number called from one of those target phones.[39] Also, on February 13 the Government investigators had been advised by a putatively reliable confidential informant that "a Negro male known to CS–3 [the informant] as Robert runs a numbers gambling office at 2312 Good Hope Road, S.E., and lays-off to the Myles organization; Robert drives a gold colored Pontiac bearing Maryland license tags." [40] In effect, Davis claims the Government should have made the connection between the informant's data and Davis' name and address as supplied by the telephone company, and that had such a connection been made there would have been probable cause to believe that Davis was involved in the gambling activity and that his conversations would be intercepted over the target telephones in the February 26 application.

Although the existence *vel non* of probable cause must be judged on the basis of the total corpus of information available to the Government,[41] we believe that as of February 26 the investigators did not have probable cause to believe "Robert" was Robert Davis, and that to accept the argument that appellant Davis was "known" because acquisition of additional data would have supplied this connection is to adopt the "discoverability" test rejected by the Su-

---

**36.** *See* note 34 *supra.*

**37.** In holding that the Government investigators may not assert such "good faith" as a justification for introducing otherwise inadmissible evidence in a court proceeding, *see* 23 D.C.Code § 551(b); note 17 *supra,* we do not mean to intimate that the same circumstances would constitute a criminal offense, *see* 23 D.C.Code § 542 (criminalizing electronic surveillance "willfully" done without complying with the statute), or would provide no defense to a civil action for liquidated damages, *see* 23 D.C.Code § 554 (defense of "good faith reliance on a court order or legislative authorization" in such civil actions).

**38.** *See* brief and appendix for appellee at 62–63 (affidavit in support of second 12th Street pen register).

**39.** *See* appendix for appellant Moore at 61a–62a (affidavit in support of 16th Street wiretap).

**40.** *Id.* at 66a.

**41.** *See* note 20 *supra.*

preme Court in *Kahn*.[42] Indeed, in his District Court memorandum supporting his motion to suppress the electronic surveillance evidence appellant Davis in effect acknowledged that a judge would have requested further information before approving a wiretap of Davis as a "known" individual. As Davis urged the trial court:

> [A]t or before the time that they made application for the electronic surveillance of the telephones located at the 12th Street address, the investigating officers had in hand evidence of a number of calls from the 12th Street phones to the phone located at 2312 Good Hope Road; had probable cause to believe that 2312 Good Hope Road was being used as a numbers office; and they knew the first name, state of residence, and type of car owned by the man who allegedly operated this office. Despite all of this information, *the Government elected not to ascertain "Robert's" identity* by February 26, 1973, the date on which he was described as a person "as yet unknown."
>
> \* \* \* *Discovery of "Robert's" last name could easily have been ascertained by physical surveillance* of the Good Hope Road address *or* merely *by asking CS–3 to obtain "Robert's" license tag number.* \* \* \* [43]

Although appellant Davis had access to Government records concerning the pen registers and wiretaps before the District Court held its suppression hearing, he made no allegations that his Maryland phone was called more frequently than any of the other 150-plus telephones disclosed through those devices.

Nor is there any evidence that Robert Davis was the only "Robert" dwelling in Maryland who was a recipient of calls from the 12th Street or Good Hope Road telephones. Rather, Davis' argument is essentially that a relatively minor amount of further investigation *would have provided* the Government probable cause to believe Robert Davis was utilizing the target telephones in the commission of gambling offenses.

■ To be sure, the test for probable cause is an objective one requiring an assessment of all information possessed by the Government at a particular moment in time. And if that information is sufficient to establish probable cause to believe that an individual will be using a target telephone for illegal activities, he must be named as a "known" person in any wiretap application and order, regardless of whether the Government believes the information has established such probable cause.[44] Our disagreement with appellant Robert Davis stems from the fact that, although Government investigators had his full name and address as well as the confidential source's information concerning the gambling activities of one "Robert," there was insufficient data upon which to say that he was the said "Robert."

■ Even Davis has recognized that more information was essential to establish this connection, and that information was not obtained until *after* the February 26 wiretap was installed. On March 3 the investigators discovered a "black over gold" Pontiac automobile in appellant Davis' driveway, and on the same date the car was seen near the Good Hope Road gambling office. The

---

**42.** *See supra,* 168 U.S.App.D.C. at ———, 513 F.2d at 493–494.

**43.** Points and Authorities in Support of Defendant Davis' Motion to Suppress Wiretap Evidence and Its Fruits at 4–5 (filed March 20, 1974) (emphasis added). As a footnote to the remark that "the Government elected not to ascertain 'Robert's' identity," appellant Davis asserted that the "investigating officers unexplainedly delayed the simple process of tracing the [Pontiac's] license tag through the Mary-

land Department of Motor Vehicles until March 3, 1973." *Id.* at 4 n.3. But as appellant Davis noted later in the quote in text, the Government did not know the license number of the Pontiac until March 3; it thus could not perform the "simple process" that would have disclosed the fact that "Robert" was appellant Robert Davis.

**44.** *See supra,* 168 U.S.App.D.C. at ———, 513 F.2d 497–499.

same day the investigators also learned from the Maryland Department of Motor Vehicles that the Pontiac was registered to Davis, and several days thereafter he was observed entering the 16th Street gambling office. These data, together with information obtained from the 12th Street wiretap, finally established probable cause concerning Davis' complicity in the gambling activities under investigation, and Davis was thus properly named as a "known" individual in subsequent pen register and wiretap applications and orders. As of the date the 12th Street wiretap was installed, however, probable cause was lacking, and although a relatively minor effort on the part of the investigators might have resulted in filling in the gaps that would have rendered Davis a "known" person within the meaning of 23 D.C.Code § 547(a)(2)(D), we are precluded by the *Kahn* decision from holding that the

Government was required to make that effort as a precondition to a valid intercept order.[45]

## III

Since appellant Davis was not a person "known" to the Government at the time of the 12th Street wiretap, we must address a second reason which he assigns as error requiring reversal of his conviction. 23 D.C.Code § 546(c) provides that investigative or law enforcement officials may obtain wiretap authorization with respect to certain enumerated D.C. Code offenses, while 23 D.C.Code § 548(b) establishes procedures to be followed should evidence of other crimes be uncovered during the course of an authorized surveillance:

> When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized by this

---

**45.** Appellant Davis also argues that even if he could not be named in the wiretap order the authorities possessed enough information to provide "a particular description of the person" whose conversations were to be intercepted. *See* note 15 *supra.* In response the Government notes that it fully informed Chief Judge Greene of the purported role of "Robert" at the Good Hope Road location. *See* brief and appendix for appellee at 12. However, the statute requires that the wiretap *order* specify the description of the known persons, and Judge Greene's order did not furnish such a description of "Robert." There is no indication in the legislative history why the "particular description" clause was included in 23 D.C.Code § 547(e)(1), since it neither reflects an obligation lodged with those applying for the order, *see supra,* 168 U.S.App.D.C. at —— ——, 513 F.2d at 492–493, nor appears in the analogous Title III provision governing issuance of federal wiretap orders, *see* 18 U.S.C. § 2518(4)(a). Of the policies subserved by the requirement that the *application* specify "known" individuals, *see* note 34 *supra,* only *post hoc* judicial review is facilitated by the requirement that the *order* specify the identity or a particular description of "known" individuals. Since Davis secured notice of the fact and circumstances of the surveillance, and since all parties agree the surveillance was conducted, as mandated by Chief Judge Greene's order, "to minimize the interception of communications not otherwise subject to interception" under the D.C. Code, *see* Application of the United States of

America in the Matter of an Order Authorizing the Interception of Wire Communications at 4 (Order Authorizing Interception of Wire Communications filed Feb. 26, 1973), we believe that any unintentional failure of Judge Greene to comply with 23 D.C.Code § 547(e)(1) was *de minimis* and does not require reversal of Davis' conviction. In any event, Judge Greene indicated that "full consideration [had] been given to the matters set forth" in the wiretap application, *see id.* at 1, which would have included the informant's data concerning "Robert." Since he did not include a description of "Robert" (which would have been vague in any event, *see supra,* 168 U.S.App.D.C. at ——, 513 F.2d at 498) in the order, we presume Judge Greene did not find that the informant's statements were sufficient to establish probable cause to believe such an individual would be using the target telephones to commit the alleged gambling offenses. In these circumstances, a "particular description" of "Robert" would not be a statutory prerequisite to a valid intercept order, and since we accord considerable deference to such conclusions of judges making probable cause determinations, *see, e. g.,* United States v. Melancon, 5 Cir., 462 F.2d 82, 89–90, cert. denied, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972), and cases cited therein, we do not find such a conclusion to be unreasonable. Thus the failure to recite the anonymous informant's information as a particular description of a "known" individual was not even a statutory violation in the case *sub judice.*

subchapter, intercepts wire or oral communications *relating* \* \* \* *to offenses other than those specified in the order of authorization* \* \* \*, *he shall make an application* to a judge as soon as practicable for approval *for disclosure and use,* in accordance with section 23–553,[46] of the information intercepted.[47]

Appellant Davis contends that since the February 26th and March 27th wiretap applications and orders did not authorize interception of evidence relating to federal offenses, and since evidence derived therefrom was used without securing court authorization as a basis for search and arrest warrants pertaining to both federal and local offenses, those warrants and the fruits thereof must be suppressed. We find this claim to be without merit.[48]

 Initially, we do not believe there was any interception "relating \* \* \* to offenses other than those specified in the order of authorization" within the meaning of 23 D.C.Code § 548(b). Admittedly, the wiretap applications and orders involved in this case could not request or authorize interception of communications concerning crimes other than those specified in 23 D.C.Code § 546(c). However, the applications and orders concerned the offenses of operating a lottery, *see* 22 D.C. Code § 1501 (1973), and maintaining gambling premises, *see* 22 D.C.Code § 1505 (1973), offenses for which 23 D.C. Code § 546(c)(1) permits the court-authorized installation of electronic surveillance equipment. When Metropolitan Police Department officers intercept conversations relating to offenses specified in an order of authorization, 23 D.C.Code § 548(b) is not operative, and 23 D.C. Code § 553(a) allows them to disclose or use those conversations "to the extent that such disclosure or use is appropriate to the proper performance of [their] official duties."[49] In this case the Metropolitan Police merely informed the FBI of the contents of conversations which concededly indicated violations of the specified D.C.Code provisions. Since these same offenses were *also* necessary constituent elements of the federal crime of operating an "illegal gambling business," which is defined as one which is, *inter alia,* "a violation of the law of the state [including the District of Columbia] or political subdivision in which it is conducted," [50] the FBI was able to join the

**46.** 23 D.C.Code § 553 provides in relevant part:

(a) Any investigative or law enforcement officer who, by any authorized means and in conformity with this subchapter, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose or use such contents or evidence to the extent that such disclosure or use is appropriate to the proper performance of his official duties.

\* \* \* \* \* \*

(c) The contents of any wire or oral communication intercepted in conformity with this subchapter, or evidence derived therefrom, may otherwise be disclosed or used only by court order upon a showing of good cause.

**47.** 23 D.C.Code § 548(b) (emphasis added).

**48.** Although we reject appellant Davis' arguments under the circumstances of this case, we feel constrained to correct the Government's erroneous assumptions concerning the proper procedure to be followed under the D.C.Code wiretap statute. Unlike the federal provisions, which allow investigative officers to disclose and use without judicial approval properly obtained evidence "relating to offenses other than those specified in the order of authorization or approval" for all purposes except testimony under oath or affirmation, *see* 18 U.S.C. § 2517(5), the District provisions prohibit *any* disclosure or use of such information without judicial approval. Thus the case law and much of the reasoning relied on by the Government, while relevant to interpretation of the federal provisions, is simply inapposite to the case *sub judice. See, e. g.,* brief and appendix for appellee at 21–23 & nn. 41–42.

**49.** *See* note 46 *supra.*

**50.** *See* 18 U.S.C. § 1955(b)(1)(i). In addition, to constitute a violation of the federal law the illegal gambling business must involve "five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business," *id.* § 1955(b)(1)(ii), and must have been "in substantially continuous operation for a period in excess of thirty days or [have] a gross revenue of $2,000 in any single day," *id.*

Metropolitan Police in seeking search and arrest warrants for appellant Davis. However, the mere fact that those conversations provided a foundation for prosecution of other than D.C.Code offenses does not alter the fact that, to the extent those conversations constituted evidence of federal offenses, they also constituted evidence of the D.C.Code offenses for which authorization had been obtained.[51]

 In any event, even if we were to hold that disclosure of evidence concerning the D.C.Code offenses to the FBI somehow transformed the interception into one "relating * * * to offenses other than those specified in the order of authorization," we would hold that the requirement of court authorization for such use was met in this case. In the application for each wiretap, the judge issuing the authorization was informed of the fact that the gambling investigation was being conducted jointly by the Metropolitan Police and the FBI, and each court order explicitly authorized the Metropolitan Police to disclose the information obtained from the surveillance to the FBI.[52] Although we

would have substantial reservations about the propriety of such "prior" compliance with 23 D.C.Code § 548(b) if it were used to circumvent court approval in situations where the evidence obtained from the surveillance was different from that contemplated by the judicial order, this is not such a case.[53] Chief Judge Greene and Acting Chief Judge Belson were fully aware of the fact that the FBI was participating in the investigation, and they could fully appreciate the fact that the federal offenses being investigated were integrally related to, though not identical with, the D.C.Code offenses for which they issued wiretap orders.

 Since the evidence obtained by the Metropolitan Police and divulged to the FBI was evidence which the issuing judges clearly anticipated would be obtained and disclosed, we find that even if the federal gambling offenses were "unrelated" offenses requiring judicial approval under 23 D.C.Code § 548(b), the procedures employed in this case fully satisfied the statutory command. For although the statutory procedures for instituting electronic surveillance must be

---

§ 1955(b)(1)(iii), *as corrected* (Supp. I 1970). Appellant Davis contends that these elements render the federal crime substantially different from the District crime, and concludes that the *interceptions* thus "relat[ed] * * * to offenses other than those specified in the order of authorization," thereby necessitating an order of approval for use under 23 D.C.Code § 548(b). However, before the wiretaps were used to obtain the search and arrest warrants pertaining to the federal offense, the Metropolitan Police had probable cause to believe at least five individuals were violating the local statute, *see supra,* 168 U.S.App.D.C. at ——, 513 F.2d at 491, and since operation of the gambling offices for two consecutive days was uncovered through those wiretaps, probable cause for obtaining a warrant for the federal offense was established as a matter of law under 18 U.S.C. § 1955(c). Thus, although all evidence that was intercepted related to offenses for which wiretap authorization could be and was given, that evidence also established probable cause to believe federal offenses were being committed. We doubt, however, that this fact should alter the characterization of the interceptions as relating to D.C.Code violations.

**51.** *See also* note 50 *supra.* Moreover, the scant legislative history of 23 D.C.Code § 548(b) also suggests that that section only requires court authorization concerning a type of crime substantially different from the one for which the intercept authority was granted. *See* S.Rep.No.538, *supra* note 1, at 22. *See also id.* at 25; S.Rep.No.1097, *supra* note 16, at 100.

**52.** *See* notes 8 & 9 *supra.*

**53.** Court authorization for disclosure and use of evidence pertaining to offenses not contemplated within the original wiretap application and order is designed to deter abuse of wiretapping procedures by guaranteeing that the original order was lawfully obtained and executed, and that it was sought in good faith and not merely as a subterfuge search for evidence relating to other crimes. *Cf., e. g.,* S.Rep.No. 1097, *supra* note 16, at 100. It is evident that the surveillance in this case would have passed muster under this test even if the approval of disclosure to the FBI came subsequent to rather than before the time the interception actually occurred.

strictly construed, we should analyze judicial approval orders in "a commonsense and realistic fashion." [54] Since there was compliance with the statutory procedures

with respect to appellant Davis, his conviction must be affirmed. [55]

So ordered.

---

**54.** *See, e. g.,* United States v. Manfredi, 2 Cir., 488 F.2d 588, 598 (1973), cert. denied, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *cf.* United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Moreover, any noncompliance with § 548(b) was harmless error. The parties in the District Court stipulated that the gambling paraphernalia seized pursuant to the warrants showed the involvement of five or more persons who were conducting an illegal gambling enterprise in violation of the D.C.Code for a period of more than 30 days. This evidence, which is sufficient to sustain Davis' conviction, *see* note 50 *supra,* would have been lawfully seized even if disclosure of the surveillance data to the FBI had been violative of § 548(b); the warrants were predicated on probable cause to believe that evidence of D.C.Code as well as federal offenses would be uncovered by the search, and the wiretap statutes do not alter the attenuation rule. *See, e. g.,* S.Rep.No. 1097, *supra* note 16, at 96.

**55.** Although he does not claim a Sixth Amendment violation, appellant Davis asserts that the 154-day hiatus between his initial arrest and indictment requires dismissal of his indictment under Criminal Rule 2–7(b)(3) of the U. S. District Court for the District of Columbia, which provides:

All indictments shall be returned within 45 days of arrest, except for good cause shown by motion filed with the Chief Judge or his designee. If the United States Attorney fails to show good cause before the Chief Judge or his designee, the matter shall be dealt with by the trial judge at arraignment or as soon thereafter as the situation comes to the trial judge's attention.

*See also* Rule 50, Fed.R.Crim.P. (requiring that District Courts prepare local plans for prompt disposition of criminal cases; plans must include rules specifying time limits within which pretrial procedures shall take place). Contrary to Davis' contention, Government non-

compliance with local Criminal Rule 2–7(b)(3) does not entitle a defendant to an automatic dismissal; if the draftsmen of the local rule had intended dismissal to be a mandatory remedy we believe they would have so indicated. Nor must the Government file a motion showing "good cause" before the Chief Judge or his designee. Rather, the rule commits the ultimate decision, if such a motion is not made, to the discretion of the trial judge.

The trial judge in this case explicitly ruled that "the government ha[d] shown good cause for delay in indictment," and he therefore denied defendants' motion to dismiss. *See* brief for appellant Davis at 33–34 (United States v. Davis, D.D.C.Crim.No. 814–73, order filed Dec. 12, 1973). In addition to finding that the defendants had not been unduly prejudiced by the delay, the trial judge determined that two factors constituted "good cause" for the delay with respect to Davis. First, an employee of the United States Attorney's office was involved in the case, *see* note 31 *supra,* and intra-office investigation and plea negotiation contributed to the delay. Second, since the original charges filed against Davis were dismissed at the preliminary hearing, less than one month after the arrest, he was not under arrest during most of the period between his initial arrest and the indictment. We hold that the trial judge's decision was not an abuse of discretion, and that refusal to grant dismissal under local Criminal Rule 2–7(b)(3) was not inappropriate under the circumstances of this complex conspiracy case. *Cf.* Barker v. Wingo, 407 U.S. 514, 530–533, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *See also* brief and appendix for appellee at 71–78 (opposition to motion to dismiss indictment filed in District Court) (over 30 individuals arrested and 27 separate search warrants executed at time of Davis' original arrest; 18 of those arrested pleaded guilty, while charges against at least five others were dropped after complete examination of evidence; trial held on stipulated evidence).