**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Anthony R. RUSSO,**
**Defendant-Appellant.**

**No. 74–1791.**

United States Court of Appeals,
Tenth Circuit.

Argued July 10, 1975.

Decided Dec. 29, 1975.

Rehearing Denied Jan. 26, 1976.

---

Kurt P. Schulke, Sp. Atty., U. S. Dept. of Justice (Robert J. Roth, U. S. Atty., on the brief), for plaintiff-appellee.

Robert G. Duncan, Gladstone, Mo., and Michael Lerner, Kansas City, Kan., for defendant-appellant.

Before SETH, McWILLIAMS and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

Anthony R. Russo was convicted by a jury of conspiring to carry on prostitution and bribery in Kansas in violation of the Kan.Stat.Ann. §§ 21–3512, 3513 and 3901 by traveling and causing travel in interstate commerce and by using and causing the use of facilities in interstate commerce, including wire communication facilities, in violation of 18 U.S.C. § 1952. On appeal the principal issue raised concerns the use at trial of certain tape recordings, and the written transcriptions thereof, which Russo contends resulted from an electronic surveillance which was in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. 18 U.S.C. § 2510 et seq. This was a lengthy trial—two trials to be exact, with the first trial resulting in a mistrial just as the jury was about to start its deliberations—and the background facts must be set forth in some detail.

By indictment Anthony R. Russo, William M. Lowman, Jerry W. Lawson, and Thomas E. Dailey were charged with conspiracy. 18 U.S.C. § 371. Prior to trial two defendants, Lowman and Lawson, pleaded guilty and later testified against Russo and Dailey. The jury acquitted Dailey, but convicted Russo.

Lowman, a resident of Missouri, decided to open up a massage parlor in Kansas City, Kansas, which would be a front for a house of prostitution. In the conduct of his business operations, which extended over a two-year period, Lowman engaged in interstate travel and used interstate wire communication facilities.

Shortly after Lowman opened his massage parlor, the local Kansas City police raided his establishment and two of his girls were arrested. It was at this point in time that Lowman first met Anthony R. Russo, a local Kansas City, Kansas, attorney. Russo was hired to represent the two prostitutes in municipal court, and he apparently succeeded in having the charges dismissed. Lowman testified that he next approached Russo in the hope that Russo could somehow gain "protection" for Lowman's operations. Russo apparently was quite active in the criminal law practice in the area and was also the attorney for a police fraternal association. In any event, according to Lowman, Russo agreed to look into the matter, and later reported back that he could, and would, afford "protection" for the sum of $300 per month. Of that amount it was understood that a portion thereof was to be passed on by Russo to one Thomas E. Dailey, who was at that time Captain of the vice unit. Lowman

further testified that as his operations expanded, first by opening another massage parlor and then by setting up prostitutes in several apartments, his payments to Russo also increased, first to $500 per month· and then to $1000 per month. The "protection" which Lowman was to receive was advance notice of any raids by the police on his massage parlors.

Shortly after Lowman opened his first massage parlor he met Jerry W. Lawson, who was a member of the Kansas City, Kansas, police department assigned to traffic control. Lowman asked Lawson to "keep an eye" on his massage parlor, and he initially repaid such courtesy by occasionally buying Lawson a dinner. He next began to from time to time give Lawson a $20 bill, and still later Lawson bought into the massage parlor business with an investment of some $1500. It was at about this time that Lawson, according to his testimony, started delivering payoff money to Dailey, the Captain of the vice squad, in return for which he too was to receive advance notice of any raids which were to be conducted by the police.

As above indicated, the main issue raised on appeal concerns wiretaps placed on telephones in the two massage parlors operated by Lowman. In this regard it is Russo's position that both the application made to the trial court for a wiretap and the order authorizing the wiretap were insufficient in that neither complied with the requirements of 18 U.S.C. § 2518. More specifically, Russo contends that the Government had "probable cause" to believe that he, Russo, was "committing the offense and whose communications are to be intercepted," and that pursuant to 18 U.S.C. § 2518(1)(b)(iv) and (4)(a) he should have been identified by name in both the application for the wiretap and the order authorizing such. Russo was not so identified, and in such circumstance Russo argues the intercepts of his telephone conversations should not have been received into evidence and his motion to suppress should have been granted. Let

us examine the several applications and orders and extensions of wiretap authorization.

On October 12, 1972, one Kurt P. Schulke, a special attorney of the Organized Crime and Racketeering Section, filed written application in the United States District Court for the District of Kansas and sought authorization to intercept wire and oral communications on the telephones located in Massage Therapy at 915 North 10th, and the Southwest Massage, located at 900 Southwest Boulevard, both in Kansas City, Kansas. These two massage parlors were operated by Lowman and the telephone located in each massage parlor was listed under Lowman's name. The application sought to intercept the wire and oral communications of William M. Lowman and "others as yet unknown." Russo's name is nowhere mentioned in the application.

The affidavit of one David D. Patton, a special agent with the Federal Bureau of Investigation, was also filed with the trial court in support of the application for a wiretap. In the affidavit, Patton stated that based on his investigative efforts, which he detailed at considerable length, he had probable cause to believe that "William M. Lowman and others as yet unknown" were committing offenses involving interstate travel. In support of his "belief" Patton set forth the "facts and circumstances" which he relied on. Much of the facts and circumstances related by agent Patton came from one Ted Irving, a former business associate of Lowman. Russo's name was mentioned several times in Patton's narration of the facts. In the main, Russo's name was injected into the matter through statements by Irving to the effect that Lowman had told him that he (Lowman) was making payoffs to Russo, and through Russo to the local police, as protection money to cover the illegal prostitution business being carried on by Lowman. So Russo's name was brought into the matter purely by way of hearsay, double hearsay we might add. We would note parenthetically that Dailey's

name was only injected into the investigation on the basis of triple hearsay.

The trial court granted the application and on October 12, 1972, authorized a twenty-day wiretap on the phones located in the Massage Therapy and the Southwest Massage. The order stated that there was "probable cause to believe that William M. Lowman and others as yet unknown have committed and are committing offenses involving the traveling in interstate commerce." Russo's name was not in anywise mentioned in the court's order.

The record indicates that there were a great number of telephone calls into and from the two telephones which had been tapped, to the end that altogether there were approximately 150 tape recordings of various intercepts which totaled approximately 7000 individual intercepts. We are here concerned with only five calls made into the tapped phones by one who identified himself as "Tony." It was later established that "Tony" was Anthony Russo, the appellant. The first of these five calls occurred on October 20, 1972, at 3:22 P.M., and the complete intercept is set forth herein as Appendix A.

On November 1, 1972, Schulke made application to the trial court to extend the wiretap orders another twenty days. In this application Schulke stated that there was probable cause to believe that "William M. Lawson, Jerry Lawson and others yet unknown have committed and are committing offenses . . ." and that there was reason to believe that these persons thus identified would be using the telephones in the two massage parlors here involved. No mention of Russo was made in the application. Russo's name was again mentioned in the supporting affidavit made by agent Patton. This application for a twenty-day extension was granted by the trial court on November 1, 1972, with Russo not being identified by name in the court's order.

On November 7, 1972, a person identifying himself as "Tony" made three calls to the telephone in the Massage Thera-py. This person was identified upon trial as being Anthony Russo, the appellant. The transcript of these three conversations is set forth as Appendix B.

The only other intercept of Russo's telephone conversations occurred on November 20, 1972, when a person using the name of "Tony" called the Massage Therapy phone number. It was later determined that the caller using the name "Tony" was in fact Anthony Russo. The conversation occurring on that particular occasion is set forth as Appendix C.

On November 22, 1972, Kurt Schulke made application to the court for an additional twenty-day extension of the wiretap order. Again it was indicated that Lowman and Lawson and "others as yet unknown" were believed to be committing offenses and using the phones on which wiretap had been previously authorized in connection with their criminal activity. No mention of Russo, as such, was made in the application.

In his supporting affidavit agent Patton did refer to Russo in several instances and he concluded with this comment:

It is also apparent that Anthony Russo and Tom Dailey, the head of the Kansas City, Kansas, Vice-squad, have some involvement in Lowman and Lawson's operations; however, at this time, the extent and nature of that involvement is not known.

On November 22, 1972, the trial court extended the wiretap order for twenty days. The order referred to Lowman and Lawson "and others as yet unknown," and did not identify Russo by name.

There were no further intercepts of any telephone conversations which were later identified as being those of Russo. However, as above indicated, there was a heavy traffic of calls both in and out of the tapped phones, but only five were later established to be those of Russo.

Prior to the first trial of his case Russo moved to suppress the use of the five tapes of his telephone calls to the phone at Massage Therapy. The trial court denied the motion and the tapes and tran-

scriptions thereof were used at trial. The method used by the Government to introduce these tapes was in the first instance to have the individual who conversed with Russo testify before the jury as to the substance of their conversation. Then, over objection, the Government would play the tape in question for the jury. Additionally, a transcription of the tape was given the jury for their use. So, the tapes merely corroborated, but effectively so, we might add, that which a witness had already testified to.

Russo contends that the wiretap orders and applications therefor were deficient in that the Government had probable cause to believe that he, Russo, was engaged in the criminal activity which precipitated the request for a wiretap, and that he would use the target phones in connection with such criminal activity. Such being the case, Russo asserts that he should have been identified by name in the wiretap orders and applications therefor and, not having been so identified, the tapes and transcriptions thereof should have been suppressed. In thus arguing, Russo relies on such cases as *United States v. Kahn*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); *United States v. Moore*, 168 U.S.App.D.C. 227, 513 F.2d 485 (1975); *United States v. Donovan*, 513 F.2d 337 (6th Cir. 1975); and *United States v. Bernstein*, 509 F.2d 996 (4th Cir. 1975).

■ The rule that we glean from *Kahn* is that if the Government "knows," i. e., has "probable cause" to believe, that a particular person is committing an offense for which the wiretap is sought, and also "knows" that such individual is likely to use the target telephone in furtherance of such criminal activity, then, and only then, need the application and order for a wiretap identify such person by name. We believe our reading of *Kahn* to be in general accord with the interpretation given that case in *Moore, Donovan* and *Bernstein*.

In denying the pre-trial motion to suppress, the trial judge in the instant case commented as follows:

[W]hile the defendant Russo was a person "known", at least by hearsay information, to be committing the offense, it was not necessary that his name be specified in the order as one whose communications were to be intercepted as he was not shown to be the owner of, or a person likely to be using the particular telephone to which the wire tap was to be attached,

. . .

■ We agree with the trial court that as of October 12, 1972, the date of the first intercept order, the Government did not have probable cause to believe that Russo would be using the target phone. We are of the further view that the Government at that point in time did not even have probable cause to believe that Russo was committing the particular offense in connection with which the tap was sought. The trial judge pointed out the weakness of any suggestion that the Government had probable cause by noting that any such belief was necessarily based on pure hearsay. We are not saying that hearsay can never support a finding of probable cause in this context. Indeed, it has been held that even double hearsay does not in and of itself preclude a finding of probable cause. *United States v. Kleve*, 465 F.2d 187 (8th Cir. 1972). We are holding, however, that the hearsay relied on in the instant case is insufficient to warrant a finding of probable cause to believe that Russo was either committing the offense for which the wiretap was sought or that he would use the target phone in furtherance of any such criminal activity.

Any suggestion that as of October 12, 1972, Russo was personally involved in the criminal activity for which the tap was sought, or that he would use the target phone in connection with such activity, is based almost entirely on statements given the FBI by one Ted Irving, a former partner of Lowman, who related statements made to him by Lowman which in turn implicated Russo. Irving's statements to the FBI were not based on any personal contact he had with Russo. There is nothing in the record to indicate

the reliability of Lowman. Indeed, at trial it developed that Lowman was a chronic name dropper. Under all the circumstances, we hold that there was not probable cause to believe that Russo was committing the offense for which the wiretap was sought or that he would be using the target phone. Hence, there was no need to identify Russo by name in either the application or order of October 12, 1972. No doubt there was suspicion that Russo was involved, but suspicion does not equate to probable cause. Having determined that the application and order of October 12, 1972, complied with the applicable statute, the trial court in our view properly admitted into evidence the tape of the intercept made on October 20, 1972.

■ Counsel also argues that assuming that the order of October 12, 1972, was proper, that by November 1, 1972, when the wiretap order was extended for twenty days, the Government had probable cause to believe both that Russo was committing the offense for which the wiretap was first sought and that he would use the target phone in connection with such activity. Whether the Government at that time had such probable cause is at best a debatable matter. Certainly the Government had no hard evidence upon which to base a belief of probable cause, only the statements of Irving as to what Lowman had told him concerning Russo, and the intercept of Russo's one telephone call made to the target phone on October 20, 1972. While that one call indicated that Russo was concerned about the slump in business, the intercept itself falls far short of establishing that Russo had in fact been assisting in the operation of the massage parlor by accepting payoff money with which to gain police protection. Probable cause to us means *probable* cause, and we doubt that the Government had such probable cause on November 1, 1972.

■ Additionally, the only intercepts of Russo made pursuant to the extension order of November 1, 1972, occurred on November 7, 1972, and November 20, 1972, and are in our view innocuous in their content. In each instance a person identified upon trial as being Russo asked for Bill Lowman. In three of these four intercepts Russo was simply advised that Lowman was not in. On one intercept Lowman was in, and he agreed to meet with Russo in the latter's office. The content of these telephone conversations did not pertain to prostitution, as such, or bribery, or interstate travel. All these four brief telephone conversations indicated was that Russo was acquainted with Lowman. And the fact that Lowman and Russo were acquainted was not in dispute. Evidence adduced at trial clearly established that such acquaintance was initiated when Russo agreed to represent two of Lowman's prostitutes who had been "busted." It was also undisputed, by way of further example that Russo and Lowman were friends, that Russo had rented Lowman one of his (Russo's) apartments in which Lowman later installed a prostitute. So, all in all, the fact that Russo and Lowman were well acquainted was not in dispute, and this is about all any of these intercepts established. It is on this basis that we conclude that the tape intercepts of November 7 and November 20, 1972, were innocuous, and the admission thereof, if it somehow be deemed error, was indeed harmless beyond a reasonable doubt.

■ We are here concerned with alleged noncompliance with a statute. Even a violation of a constitutional right does not require a reversal if the error was harmless beyond a reasonable doubt. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In this general regard, *see also United States v. Rizzo*, 492 F.2d 443 (2d Cir. 1974), where in a slightly different context it was held that the "touchstone" in determining whether to suppress wiretap evidence on a claim of failure of notice should be resultant prejudice to the defendant. In our best view the five tapes

of Russo's calls to the target phone played only a minor role in the trial and did not in any real sense prejudice Russo. The damaging testimony came from Lowman, Lawson, Harmon, an unindicted coconspirator, Jodie White, a prostitute, and one Wayne McGraw, Russo's own real estate broker, who, at Russo's direction, rented one of Russo's apartments to Lowman for the purpose of furthering Lowman's prostitution activities.

■ Both before and after trial Russo attacked the sufficiency of the indictment. In this regard it is Russo's position that the indictment merely charged Russo and the others with conspiracy to violate the laws of Kansas in regard to prostitution and bribery, and that such does not state a federal offense. Although the indictment under consideration could of course have been somewhat differently couched, we nonetheless believe it does charge a federal offense.

In the first instance the indictment alleges that the various defendants conspired to violate Kansas laws regarding prostitution and bribery "by traveling and causing travel in interstate commerce and by using and by causing the use of facilities in interstate commerce, including wire communication facilities, in violation of Section 1952, Title 18, United States Code. . . ." Following the aforesaid allegations the indictment then sets forth some twenty-two overt acts and concluded with the following: "All in violation of Section 371, Title 18, United States Code." Such in our view adequately pleads a federal offense.

Fed.R.Crim.P. 7 declares that an indictment shall be a plain, concise and definite statement of the essential facts constituting the offense charged. In *United States v. Wilshire Company of Texas,* 427 F.2d 969 (10th Cir. 1970), we commented as follows:

> To determine the sufficiency of an indictment the court views the entire document to ascertain whether the offense is charged with sufficient

clarity so as to safeguard two constitutional guarantees; the Sixth Amendment right to be informed of the nature and cause of the accusation in order to prepare a defense; and the Fifth Amendment protection against twice being placed in jeopardy for the identical offense.

In our view the indictment in the instant case is sufficient under the general principles above enunciated. Starting at the end of the indictment and then working backward, it is clear to us that the indictment charges a federal conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. § 1952 by traveling in interstate commerce with an intent to promote unlawful activity in Kansas in violation of the laws of Kansas. Russo's attack on the present indictment is essentially one of semantics. We deem the indictment to be sufficient.

■ Prior to the first trial of this matter, Russo filed a motion for a hearing as to the admissibility of the results of certain polygraph examinations. Apparently Russo had at his own instance undergone a so-called "lie detector" test and he sought to have the results thereof introduced at trial. The trial judge indicated that he was of the definite view that under existing Tenth Circuit law the results of a polygraph test were not admissible in evidence. However, the trial judge did not absolutely foreclose a hearing on the matter, and suggested that counsel for Russo make an offer of proof to assist in any final determination as to whether there should be a full hearing on the question. When the case came on for trial some two months later, no such offer of proof had been made. Accordingly, the trial court on the first day of the trial denied Russo's motion for a hearing. Then, a day or two later, a formal offer of proof was made by counsel. In our view the offer of proof, in addition to being untimely filed, was itself insufficient to require the trial court to hold a full-scale evidentiary hearing into the matter.

It is true that in *United States v. Wainwright,* 413 F.2d 796 (10th Cir.

1969), there is some indication that conceivably the results of a polygraph test might at some future date constitute admissible evidence, with the comment that "matters of factual proof must keep pace with developing scientific standards." However, in *Wainwright* we quoted with approval from Wigmore to the effect that before such evidence be admitted there must be a showing, and we would here add a strong showing, " 'that the proposed test is an accepted one in [the] profession and that it has a reasonable measure of precision in its indications.' " In our view the belated offer of proof in the instant case does not. meet the requirements of *Wainwright* and is not such as to have compelled the trial court to hold an evidentiary hearing on the matter. For other Tenth Circuit cases holding that the results of a lie-detector test are inadmissible, *see Wainwright v. United States*, 448 F.2d 984 (10th Cir. 1971), and *United States v. Rodgers*, 419 F.2d 1315 (10th Cir. 1969).

■ The remaining matters urged on appeal are relatively minor in nature and do not merit much comment. We find no error in the instructions given the jury concerning statements made prior to trial which are inconsistent with testimony given at trial, and the impeaching effect thereof.

■ Similarly, in our view there was no need to instruct the jury on any "two conspiracy" theory. There was but one conspiracy, involving several different persons, each playing his own role, and involving interstate travel for the purpose of promoting and maintaining houses of prostitution in violation of Kansas law. The fact that prostitution was carried on in both massage parlors and apartments does not make for two conspiracies. Nor is the bribery aspect of the case a separate matter. The bribery was for the purpose of furthering the prostitution operation and was in a sense ancillary thereto.

■ The final contention that the evidence is legally insufficient to support the verdict is wholly untenable. The

rather lengthy recitals in this opinion should fully convince the disinterested reader, if not the defendant himself, that the evidence is amply sufficient to support the verdict.

Judgment affirmed.

## APPENDIX A.

Time: 3:22 P.M.

Date: October 20, 1972

Telephone number: 371–2989

TERRY: Hello.

TONY: Hi, Terry. Hello, who's this?

TERRY: This is Terry.

TONY: Terry, this is Tony. How are you baby?

TERRY: Uh, huh, fine

TONY: Listen, is Bill there?

TERRY: He just left

TONY: Where'd he go, back to the other place?

TERRY: I don't know. He said, well, I'm going, I'll see you later. I said OK. He didn't tell me. Walked out the door about five minute ago.

TONY: What's the number on 10th Street?

TERRY: Uh, 321

TONY: Just a minute, OKay.

TERRY: 321–0026

TONY: 0026

TERRY: Un, huh.

TONY: How you doing? Any good?

TERRY: No, I haven't made a dime in a week.

TONY: Really

TERRY: Hasn't been a customer up here all week.

TONY: What the hell's going on.

TERRY: I don't know, but I'm getting ready to quit. I can't stand it. I told Bill today.

TONY: What'd he say?

TERRY: What can he say? Nothing.

TONY: No I mean there's got to be a reason why we're not getting, why you haven't got any business.

TERRY: I don't know. Bill just opened up a new Massage house.

TONY: Where?

TERRY: Hank and Berta

TONY: Where's that?
TERRY: 17th and Stewart
TONY: Bill opened it?
TERRY: No. Um un.
TONY: Who opened it? Do you know?
TERRY: Hank and Berta somebody
TONY: 17th and Stewart, hum. Okay, I'll talk to you later baby
TERRY: Okay, bye bye.

## APPENDIX B.

Time: 12:15 p. m.
Date: 11/7/72
Telephone number: 371–2989
PAF: Hello.
TONY: Hi, this is Tony, is Bill there
PAF: No he isn't
TONY: Ah, is he down in Springfield, honey, or is he up here
PAF: He's probably back here, he's usually up here about 2:30 or 3:00, he should be up here about 3 o'clock
TONY: Tell him I called and its important I want to talk to him
PAF: Tony
TONY: Yeah
PAF: Ok, then
TONY: Thank honey—bye
PAF: Ok bye

\*　　\*　　\*　　\*　　\*　　\*

Time: 4:30 p. m.
Date: 11/7/72
Telephone number: 371–2989
PAF: Therapy Massage
TONY: Hi, this is Tony is Bill there?
PAF: Ah, he hasn't come in yet Tony, I got a message up here for him to call you

TONY: Yea, its important I want him to get a hold of me, OK
PAF: OK
TONY: Thank honey—bye
PAF: Bye

\*　　\*　　\*　　\*　　\*　　\*

Time: 5:12 p. m.
Date: 11/7/72
Telephone number: 371–2989
BILL: Hello
TONY: Bill
BILL: Yeah
TONY: This is Tony
BILL: Yeah, I was just trying to get ya, just came in just right now
TONY: OK, are you coming down here or tonight or what
BILL: I can come tonight or in the morning
TONY: Well, I've got some people who have been waiting on me, why don't, can you come over now
BILL: Yes, I can run over there
TONY: OK, see you in a little bit, bye, bye
BILL: OK

## APPENDIX C.

Time: 5:35 P.M.
Date: November 20, 1972
Telephone number: 321–0026 to 371–2989
TONY: 2989?
PAF: Therapy Massage
TONY: Is Bill there? This is Tony.
PAF: No, he isn't.
TONY: OKay, Thank you.
PAF: Uh, huh.
TONY: Yeah, he's not there.