**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Anthony ANTHON, Defendant-Appellant.**

**No. 80–1035.**

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 28, 1981.

Decided May 4, 1981.

Rehearing Denied June 11, 1981.

---

R. E. Thompson, U. S. Atty., Albuquerque, N. M. (Larry Gomez, Asst. U. S. Atty., Albuquerque, N. M., with him, on brief), for plaintiff-appellee.

Sarah M. Singleton of Pickard & Singleton, Santa Fe, N. M. (Timothy M. Padilla, Albuquerque, N. M., with her, on brief), for defendant-appellant.

Before McWILLIAMS, BARRETT and SEYMOUR, Circuit Judges.

BARRETT, Circuit Judge.

Anthony Anthon (Anthon) appeals his jury conviction of possession with intent to distribute cocaine in violation of 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2.

Anthon was jointly charged in two counts, Counts I and XII of a twelve count indictment, with co-defendants Robert Harris (Harris) and Craig Bunton (Bunton). Count I charged Anthon with conspiracy to distribute cocaine over a period extending from July 12, 1979 to September 7, 1979. Count XII charged:

> On or about the 7th day of September, 1979, at Albuquerque, in the State and District of New Mexico, the defendants, ROBERT G. HARRIS, CRAIG W. BUNTON and ANTHONY ANTHON, unlawfully, knowingly and intentionally did possess with intent to distribute a quantity of cocaine ...
>
> [R., Vol. I, at p. 6].

The jury found Anthon not guilty of Count I and guilty of Count XII.

The Government established its case against Anthon on the testimony of four special agents of the Department of Justice, Drug Enforcement Administration (DEA), a detective with the Albuquerque Police Department, and co-defendant Harris.

DEA agents Lester Tuell and Robert Hastings, acting in undercover capacities, testified relative to a meeting with Harris and Bunton on September 6, 1979, the day before the sale, during the course of which Bunton told them that one pound of cocaine would be arriving the next day, that his connection was in Miami, Florida, and that his connection would arrive from Florida the next day between 12:00 and 2:00 p. m. It was then agreed that the sale to Tuell and Hastings would take place the next day at Harris' house. Tuell and Hastings also

testified to the arrest of Harris and Bunton on September 7, 1979, after the cocaine arrived and a sale was attempted.

Detective Mike Dwyer testified relative to the surveillance of the Harris house on September 7, 1979, and his personal observations of Bunton leaving the house, proceeding to the airport to pick up an individual (later determined to be Anthon), leaving the airport, proceeding to the Airport Marina Hotel, and subsequently returning to the Harris residence.

Agents Abenicio Cordova and Rueben Prieto testified relative to the surveillance of Anthon's room at the Airport Marina Hotel, their arrest of Anthon after being notified by Agent Tuell that a large quantity of cocaine had been seized, and their subsequent interrogation of Anthon.

Harris, after pleading guilty to Count XII, testified relative to the events leading up to the September 7, 1979, sale, including a phone call Bunton received while at his (Harris') residence around noon on September 7, 1979, after which Bunton departed for the airport to meet the courier and later returned with a pound of cocaine.

Anthon testified in his own defense to the events surrounding his arrest at the Airport Marina Hotel. He denied bringing in a pound of cocaine from Florida. He stated that the small vial of cocaine found in his hotel room following his arrest had been given to him by Bunton.

Prior to trial, Anthon moved to suppress the evidence seized at the time of his arrest and the statements he had made to law enforcement officers after his arrest. A hearing was held on both motions, after which they were denied.

On appeal Anthon contends the trial court: (1) erroneously admitted certain statements he had made at a time when he had not been fully apprised of his *Miranda* rights; (2) erroneously admitted into evidence items seized from his hotel room; and (3) committed reversible error by admitting evidence of other crimes of which he was not a participant, together with statements of co-conspirators which were totally irrelevant to him.

## I.

Anthon contends the trial court erroneously admitted statements he made at the time of his arrest because they were uttered at a time when he had not been fully advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Anthon was arrested in a hallway of the Airport Marina Hotel immediately after he had exited his hotel room. At that time he was advised that he had a right to remain silent, that anything he said could and would be used against him in a court of law, and that he had a right to counsel. Although Anthon stated that he understood his rights, it is uncontested that Anthon was not advised that his right to counsel encompassed the right to appointed counsel in the event he could not afford counsel, that his right to counsel encompassed the right to have counsel present during any questioning, and that he had the right to stop the questioning at any time.

After being advised of his rights, Anthon, who was wearing a swimming suit, was taken back into his hotel room where he was allowed to change clothes, and gather his personal effects. He was also questioned by the arresting officers before being taken to the Albuquerque district office of the DEA for processing.

During the course of this questioning Anthon gave a fabricated answer that he had walked to the hotel. Later, he admitted that this answer was fabricated when it became apparent to him that the agents knew how he had arrived at the hotel. Anthon also told the agents that he was vacationing in Albuquerque and that a small vial of cocaine and a marijuana cigarette found in the room were his. [Appellant's Brief at p. 6].

Anthon was subsequently taken to the DEA district office for processing and continued questioning. En route to the office Anthon indicated a desire to "cooperate" with the officers. Once at the office Agent Cordova testified relative to advising Anthon of his rights a second time.

Q [By United States Attorney Larry Gomez] And did you finally get to the Albuquerque District Office?

A [By Agent Abenicio Cordova, Jr.] Yes, we did.

Q And what occurred there?

A We took him to our office and began to process him; processing him, fingerprinting him, taking his personal history, photographing him. And at that time, I asked Mr. Anthon if he was still aware of his rights, he could have a right to remain silent, which he stated, "Yes. Yes, I know all about that."

Q Was he under the influence of any drug or alcohol?

A No. He appeared to be very coherent and to be an intelligent person.

Q Was his speech slurred or did he have any problem walking or anything?

A No.

[R., Vol. III, at pp. 119–120].

On cross-examination Agent Cordova further testified:

Q [By Tim M. Padilla, defense counsel] Was he calm?

A He was very cooperative.

Q Then you've testified that you advised him again when you took him down to the DEA office, you stated, I believe it was your statement that you advised him of his rights, you said, "You know your rights, and you have the right to remain silent"?

A That's correct. And at that time he appeared to be annoyed that I repeated that particular portion again, and he said, "Yes. Yes, I know all about that."

[R., Vol. III, at p. 128].

After processing Anthon at the DEA office, Anthon was advised of his rights a third time by Agent Cordova:

A We then placed Mr. Anthon in a room directly across the hallway from the fingerprint room, and myself and Special Agent Prieto spoke to Mr. Anthon and again advised him of his

rights and stated, asked him if he would be interested in assisting the Albuquerque District Office. He made a statement, "What exactly do you mean by assisting?" The conversation went on to the extent that I told him that we would be interested in possibly getting major drug dealers that he might possibly know. And I, again, at this time, stated that he knew he did not have to talk to us, but it was his choice. Mr. Anthon stated that he would like to have some kind of guarantee as to what we could possibly do for him. I advised him that I was not in any position to make any guarantees to him, about the only thing I could do is bring it to the attention of the Court when and if he decided he wanted to cooperate.

[R., Vol. III, at pp. 120–121].

Subsequent thereto Agent Cordova testified that Anthon admitted bringing in the sixteen ounces of cocaine for the sale herein:

A  At this time, Mr. Anthon stated that he could assist us with some heavy people that he knew in Florida and also Atlanta, Georgia. I asked him what was the heaviest deal he had ever done, and which he stated, "The deal right now." And I asked him, "What deal are you talking about?" and he said, "The sixteen ounces that you guys got." He stated that, however, if he was to return to Florida without the money for the sixteen ounces of cocaine, that it would make too much heat on him and he wouldn't be able to assist us in this manner.

[R., Vol. III, at p. 122].

Within this background, Anthon structures the underlying issues as follows:

These facts present the issues of (1) whether the admission to having lied to the agents, and the admission to possession of cocaine and marijuana were admissible in evidence despite the fact that the warning given failed to include the right to appointed counsel, the right to have counsel present during questioning and the right to stop the questioning at any time and (2) whether the admission to having transacted the pound deal was admissible in evidence despite the fact that the warning given failed to include the right to have counsel present during questioning and the right to stop the questioning at any time.

[Appellant's Brief at p. 7].

Anthon argues his statements were inadmissible under *Miranda* as reaffirmed in *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) in which the Court opined:

The rule the Court established in *Miranda* is clear. In order to be able to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation. 442 U.S. at p. 717, 99 S.Ct. at 2568.

Anthon further argues that his statements were inadmissible under *United States v. DiGiacomo*, 579 F.2d 1211 (10th Cir. 1979) (Barrett, J., dissenting) in which the majority stated:

Although there may be no express requirement to warn suspects of the right to terminate questioning, the Government's failure to so warn is certainly an important factor to be considered in determining the voluntariness of any statements made. Further the right to appointed counsel is a significant right which cannot be excluded from the advisement.

579 F.2d at p. 1214.

■ We agree with Anthon that under his issue (1) *supra*, "the admission to having lied to the agents, and the admission to possession of cocaine and marijuana" were improperly admitted inasmuch as Anthon was not fully advised of his *Miranda* rights at the time he was originally arrested. We hold, however, that the error in admitting these particular statements was harmless. Anthon was not charged with simple possession of cocaine and marijuana. Accord-

ingly, the admission of these statements, made at the time of his arrest, did not give rise to reversible error.

█ We do not agree, however, with Anthon's second allegation that under his issue (2) his "admission to having transacted the pound deal" was improperly admitted "since he was not advised of the right to have counsel present during questioning and the right to stop the questioning at any time."

At the time Anthon acknowledged that the pound "deal" was his largest transaction and was the "heaviest deal he had ever done", he had been accorded *Miranda* advisements three distinct times. To be sure, the first advisement at the time of his arrest was inadequate, as was the second advisement following his arrival at the DEA district office. However, nothing in this record indicates that the third advisement, which occurred "in a room directly across the hallway from the fingerprinting room" was inadequate. It was at that time that Agent Cordova stated that he "again advised him [Anthon] of his rights." Significantly, Anthon does not challenge the sufficiency of this advisement under issue (2), save to contend the statement he made thereafter relative to the "pound deal" was inadmissible because "the warning given failed to include the right to have counsel present during questioning and the right to stop the questioning at any time."

Nothing in the record before us establishes other than that Anthon was advised of the right to have counsel present. This is strongly indicated, in that prior to Anthon's acknowledging that the "pound deal" was the "heaviest deal he had ever done", Agent Cordova specifically stated "And I, again, at this time, stated that he knew he did not have to talk to us, but it was his choice." [R., Vol. III, at p. 120]. Subsequent thereto, Anthon continued to discuss the possibility of assisting the officers if they would give him some type of guarantee of what they would do for him. Under these circumstances, we hold that Anthon's statements relative to the "pound deal" being the "heaviest deal he had ever done" were properly admitted.

The *Miranda* rules are "a set of 'procedural safeguards'" which were not intended "to create a constitutional strait jacket ... but rather to provide practical reinforcement for the right against compulsory self incrimination." *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) at pp. 441, 443–444, 94 S.Ct. at pp. 2362, 2363–2364. Nothing before us indicates that Anthon's statement that the "pound deal" was his "heaviest deal" was an act of "compulsory self incrimination" brought on by the interrogating officers. On the contrary, the record establishes that Anthon voluntarily uttered the statement at the time he was trying to work out a "deal" with the arresting officers whereby he would assist them "with some heavy people he knew in Florida and also Atlanta, Georgia."

Such statements are clearly admissible under *Miranda.* The Court there opined:

... Any statement freely given and voluntarily without any compelling influences is, of course, admissible in evidence.... Voluntary statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

384 U.S. at p. 478, 86 S.Ct. at 1630. Under this standard, Anthon's statement was properly admitted.

## II.

Anthon contends "the admission into evidence of items seized from the defendant's hotel room after the defendant was arrested outside his hotel room was in violation of the Fourth Amendment to the United States Constitution because the seizure was without a warrant and fell within no exception to the warrant requirement."

As noted *supra,* Anthon was arrested outside of his hotel room. Immediately subsequent thereto, the arresting officers took Anthon, who was dressed in his swimming suit, back into his hotel room where they remained for a period of thirty to forty minutes, during which time they questioned

Anthon and allowed him to collect his personal effects. It was during their presence in Anthon's room that the officers discovered a vial of cocaine, another small vial, a marijuana cigarette and some documents including airline tickets.

Anthon acknowledges that "In the light most favorable to the Government, these items were located by the agents once they were inside the hotel room in a manner unoffensive to the Constitution." [Appellant's Brief at pp. 11–12]. Anthon contends, however, that the officers' entry into and presence in his hotel room without a search warrant was in violation of his constitutional rights. We agree.

An arresting officer may search the arrestee's person to discover and remove weapons and to seize evidence to prevent its concealment or destruction, and may also search the area within the arrestee's immediate control. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Thus, the arresting officers herein were authorized to search Anthon at the time of his arrest in the hotel hallway. However, they were not, absent Anthon's specific request or consent, empowered to return Anthon to his hotel room and there effectuate a search without benefit of a search warrant. Anthon had not abandoned his room at the time of his arrest. *See Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). The arrest in the hotel hallway did not provide exigent circumstances justifying a warrantless search of the hotel room. *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). Furthermore, the Government did not come forward and establish the existence of any exceptional circumstances dictating the necessity of the search without a warrant. As the Court opined in *Vale v. Louisiana, supra* :

> But entirely apart from that point, our past decisions make clear that only in "a few specifically established and well-delineated" situations, *Katz v. United States*, 389 U.S. 347, 357 [88 S.Ct. 507, 514, 19 L.Ed.2d 576], may a warrantless search of a dwelling withstand constitu-

tional scrutiny, even though the authorities have probable cause to conduct it. The burden rests on the State to show the existence of such an exceptional situation. *Chimel v. California, supra* [395 U.S.], at 762 [89 S.Ct. at 2039–2040], *United States v. Jeffers*, 342 U.S. 48, 51 [72 S.Ct. 93, 95, 96 L.Ed. 59]; *McDonald v. United States*, 335 U.S. 451, 456 [69 S.Ct. 191, 193–194, 93 L.Ed. 153]. And the record before us discloses none.

> There is no suggestion that anyone consented to the search. Cf. *Zap v. United States*, 328 U.S. 624, 628 [, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477]. The officers were not responding to an emergency. *United States v. Jeffers, supra* [342 U.S.] at 52 [, 72 S.Ct. at 95–96]; *McDonald v. United States, supra* [335 U.S.] at 454 [69 S.Ct. at 192–193]. They were not in hot pursuit of a fleeing felon. *Warden v. Hayden*, 387 U.S. 294, 298–299 [, 87 S.Ct. 1642, 1645–1646, 18 L.Ed.2d 782]; *Chapman v. United States*, 365 U.S. 610, 615, [81 S.Ct. 776, 779, 5 L.Ed.2d 828]; *Johnson v. United States*, 333 U.S. 10, 15 [, 68 S.Ct. 367, 369, 92 L.Ed. 436]. The goods ultimately seized were not in the process of destruction. *Schmerber v. California*, 384 U.S. 757, 770–771 [, 86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908]; *United States v. Jeffers, supra; McDonald v. United States, supra,* at 455. Nor were they about to be removed from the jurisdiction. *Chapman v. United States, supra; Johnson v. United States, supra; United States v. Jeffers, supra.*

399 U.S. at pp. 34–35, 90 S.Ct. at 1972. *See also: United States v. Agapito*, 620 F.2d 324 (2d Cir. 1980) (U.S.App.Pndg.), for the general rule that warrantless search of dwelling or hotel room is unconstitutional; and *United States v. Aguiar*, 610 F.2d 1296 (5th Cir. 1980) (U.S.App.Pndg.), for the rule that a warrantless search of a dwelling can not be made incident to an arrest occurring outside the building.

There is nothing in the record before us indicating that Anthon requested to be returned to his room or that he consented to the officers' entry into the room. Under

such circumstances, and in the absence of any exigent circumstances dictating that the officers undertake an immediate search of the room, we hold that the warrantless search of Anthon's hotel room was in violation of his constitutional rights.

This case is not, as urged by the Government, controlled by our recent decision in *United States v. Burns*, 624 F.2d 95 (10th Cir. 1980). We there upheld a limited, warrantless search of a motel room incident to the lawful arrest of its occupants. In *Burns* the arrest occurred at the motel room door and the right to a "limited warrantless search" of a motel room was considered acceptable when, as there, "the arrest occurs at the entrance way" [door] of the motel room.

■ Having determined that the search of Anthon's room was in violation of his constitutional rights, we must now ascertain whether the admission into evidence of the items seized as a result of the search, i. e., a vial of cocaine, a second small vial, and a marijuana cigarette, gave rise to reversible error. We hold that it did not. The admission of these items under the totality of the facts and circumstances contained in this record, although error, was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Russo*, 527 F.2d 1051 (10th Cir. 1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 831 (1976), *rehearing denied*, 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976).

Our review of the facts established and the evidence properly admitted against Anthon convinces us that the admission into evidence of the items seized during the warrantless search of Anthon's room did not constitute reversible error.

Significant to our determination is the fact that Anthon was charged with possession with intent to distribute cocaine. He was not charged with simple possession of cocaine and marijuana. Furthermore, the Government's evidence against Anthon was overwhelming. The evidence established Anthon being picked up at the airport by Bunton; Anthon's and Bunton's trip from the airport to the hotel; Bunton's departure from the hotel and subsequent arrest at Harris' residence; Harris' testimony that on the day of the sale Bunton received a phone call while at his [Harris'] residence after which he [Bunton] went to the airport to meet the courier who was bringing the cocaine in from Florida; Harris' testimony that he had been instructed to send the proceeds of a previous sale, some $8,000.00, to Anthon; and Anthon's voluntary statement to the arresting officers after he was taken to the DEA district office that the "pound deal" today was the "heaviest deal he had ever done."

Under these circumstances, we hold that the admission of the vial of cocaine, the other small vial, and the marijuana cigarette constituted harmless error beyond a reasonable doubt. Our determination here is not to be interpreted as an endorsement of the warrantless entry into a hotel room. Although the trial court record may very well have established that Anthon requested that he be allowed to re-enter the hotel room to change his clothes and gather his personal effects if the trial attorneys had properly pursued interrogation in this regard, the fact is that there is nothing in the record before us to indicate whether such a request was made. On the contrary, the record simply indicates that immediately following Anthon's arrest the officers returned him to his room. Accordingly, the warrantless entry into Anthon's hotel room was violative of his rights secured by the Fourth Amendment. Even so, it constituted harmless error.

### III.

Anthon contends that the trial court erroneously admitted testimony concerning "a mass of substantive crimes and conspiracies of which" he was not a participant, including statements of co-conspirators which were "totally irrelevant" to him.

As set forth, *supra*, Anthon was charged in Count I with conspiracy to distribute cocaine with Harris, Bunton, and one

Charles Highum. The Government did present evidence relative thereto during the course of the trial.

In *United States v. Andrews*, 585 F.2d 961 (10th Cir. 1978) we addressed a similar allegation of error and, in conjunction therewith, we reviewed the general law of conspiracy. In so doing we stated, *inter alia*:

> The essence of the crime of conspiracy is an agreement to violate the law. *United States v. Butler*, 494 F.2d 1246 (10th Cir. 1974); *Carter v. United States*, 333 F.2d 354 (10th Cir. 1964). The evidence in a criminal conspiracy trial, such as the instant case, need only establish the *existence* of a conspiracy and that a defendant *knowingly contributed* his efforts in furtherance thereof. *United States v. Jackson*, 482 F.2d 1167 (10th Cir. 1973), *cert. denied*, 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974); *Collins v. United States*, 383 F.2d 296 (10th Cir. 1967). The nature of the offense of conspiracy with its attendant aspects of secrecy, often requires that elements of the crime be established by circumstantial evidence. Thus, the common plan or purpose may be inferred from a combination of circumstances. *Jordan v. United States*, 370 F.2d 126 (10th Cir. 1967), *cert. denied*, 386 U.S. 1033, 87 S.Ct. 1484, 18 L.Ed.2d 595 (1967); *Baker v. United States*, 329 F.2d 786 (10th Cir. 1964), *cert. denied*, 379 U.S. 853, 85 S.Ct. 101, 13 L.Ed.2d 56 (1964). The Government's evidence may establish an ongoing course of conduct giving rise to one continuing conspiracy, covering an extended period of time. *United States v. Bridwell*, 583 F.2d 1135 (10th Cir. 1978); *United States v. Gunter*, 546 F.2d 861 (10th Cir. 1976), *cert. denied*, 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977). Accordingly a party may join an ongoing conspiracy during its progress and become criminally liable for all acts done in furtherance of the scheme. *United States v. Gamble*, 541 F.2d 873 (10th Cir. 1976); *United States v. Thomas*, 468 F.2d 422 (10th Cir. 1972), *cert. denied*, 410 U.S. 935, 93 S.Ct. 1389, 35 L.Ed.2d 599 (1973). Once a conspiracy is established, only slight evidence is required to connect a co-conspirator. *United States v. Turner*, 528 F.2d 143 (9th Cir. 1975), *cert. denied*, 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1976); *United States v. Rodriguez*, 498 F.2d 302 (5th Cir. 1974); *United States v. Marrapese*, 486 F.2d 918 (2nd Cir. 1973), *cert. denied*, 415 U.S. 994, 94 S.Ct. 1597, 39 L.Ed.2d 891 (1974).

585 F.2d 961 at p. 964.

Appreciative, therefore, of the broad parameters within which a conspiracy may be effectuated, and the secretive nature in which conspiracies are generally consummated, we then specifically addressed the issue as to when the acts and declarations of one co-conspirator were admissible against another.

We have previously held that acts and declarations of one co-conspirator are admissible against another if the *existence* of a conspiracy is in fact first established by independent evidence and if the acts and declarations occurred during and in furtherance of the conspiracy. *United States v. Jones*, 540 F.2d 465 (10th Cir. 1976), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977); *Lowther v. United States*, 455 F.2d 657 (10th Cir. 1972), *cert. denied*, 409 U.S. 857, 93 S.Ct. 114, 34 L.Ed.2d 102 (1972).

585 F.2d at pp. 964–965.

*Andrews, supra*, was subsequently clarified in *United States v. Petersen*, 611 F.2d 1313 (10th Cir. 1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980), in which we stated:

> In *Andrews*, we considered the effect of the Federal Rules of Evidence on our rule then in effect which allowed the judge and jury to share the responsibility for determining whether a statement made by one member of a conspiracy, during the course of and in furtherance of the conspiracy, may be used against other members of that conspiracy. Following the rule laid down in *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977), we held, in *Andrews*, that such statements could be admitted, at the close

of all evidence and prior to submission of the case to the jury, only if the trial judge determines that it is "more likely than not" that the conspiracy existed, that the declarant and the defendant against whom the conspirator's statement is offered were members of that conspiracy, and that the statement was made during the course and in furtherance of the conspiracy. In adopting the "more likely than not", or preponderance of the evidence, standard applicable at this stage of the trial, we modified our prior rule in view of the impact of the Federal Rules of Evidence. Our prior rule required only that the trial judge initially determine whether there was *prima facie* independent evidence establishing proof of the elements enumerated above; if so, the judge was then to submit these matters to the jury for its determination, in deliberations. The jury was instructed that it must determine whether or not the Government established the three elements beyond a reasonable doubt before considering the co-conspirator hearsay statements. We recognized in *Andrews* that the new rules thus placed greater responsibility on the trial judge in determining the quantum of proof of the essential elements aforesaid.

611 F.2d 1313 at pp. 1327–1328.

■ Applying *Andrews, supra*, as further clarified by *Petersen, supra*, we hold the trial court did not err in admitting evidence of acts and statements of Anthon's alleged co-conspirators as charged in Count I. In our view, the trial court properly admitted the challenged evidence inasmuch as the Government established by a preponderance of the evidence, and more likely than not, that a conspiracy existed. The fact that the jury subsequently did not find Anthon guilty of conspiracy as charged *beyond a reasonable doubt*, does not vitiate the efficacy of the trial court's prior determination that the conspiracy was established by a *preponderance of the evidence*, rendering the acts and statements of alleged co-conspirators admissible. Furthermore, the admission of evidence relative to the alleged conspiracy did not "fatally infect" Anthon's conviction on the substantive count of distribution in view of the overwhelming evidence presented relative thereto. *See United States v. Alanis*, 611 F.2d 123 (5th Cir. 1980), *cert. denied*, 445 U.S. 955, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980).

The distinctions as to what must be proved to invoke the co-conspirator hearsay exception, *vis a vis, admissibility*, and what must be proved in order to *convict* a person of the crime of conspiracy must always be recognized in cases such as the one at bar. *See United States v. Gil*, 604 F.2d 546 (7th Cir. 1979). Once the Government has made a proper showing of admissibility, the admission of testimony under the co-conspirator exception to the hearsay rule is not rendered retroactively improper by the subsequent acquittal of the alleged co-conspirator. *United States v. Cravero*, 545 F.2d 406 (5th Cir. 1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977), *rehearing denied*, 431 U.S. 960, 97 S.Ct. 2689, 53 L.Ed.2d 279 (1977), *rehearing denied*, 433 U.S. 915, 97 S.Ct. 2990, 53 L.Ed.2d 1102 (1977); *United States v. Jacobs*, 475 F.2d 270 (2d Cir. 1973), *cert. denied*, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973).

WE AFFIRM.

SEYMOUR, Circuit Judge, dissenting:

I must respectfully dissent from the majority's conclusion that the third *Miranda* warning given in this case was adequate, and that incriminating statements made thereafter by Anthon were voluntary.

The majority concedes that the first two "Miranda advisements" were inadequate. But it relies upon Agent Cordova's statement that he "again advised him [Anthon] of his rights" to find that "nothing in this record indicates that the third advisement was inadequate." At 674. This presumption of adequacy violates the stricture of *Miranda* that the Government bears the heavy burden of proving the warnings were given and were knowingly and intelligently waived. *See Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966).

To presume adequacy here is especially unwarranted given the circumstances. At the suppression hearing, Cordova testified that he first gave Anthon his rights at the hotel. He told Anthon that he had the right to remain silent, that anything he said could be used against him, and that he had a right to counsel. The right to appointed counsel if he could not afford one, the right to have counsel present during questioning, and the right to stop the questioning at any time were not mentioned. Cordova testified further that while he and Agent Drieto were processing and fingerprinting Anthon, "I had made a statement to Mr. Anthon that again he knew of his rights and he did not have to tell us anything, which he stated he was aware of." Rec., vol. II, at 40. The effect of this advisement might well have been to reinforce the impression that Anthon's rights were limited to the three read to him at the hotel. There was no mention at the suppression hearing of the third advisement the majority relies upon, or of a statement to Anthon that counsel "probably" would be appointed for him the following day if he could not afford a lawyer. Cordova merely testified at that hearing that he told Anthon "[h]e could *retain* counsel and proceed with the judicial proceedings. It was entirely up to him." Rec., vol. II, at 41 (emphasis added). Only at trial did Cordova mention a third warning in which he "again advised him of his right," Rec., vol. I, at 120, and told him that "*probably* the following day, he would have a Magistrate Hearing, and at that time if he couldn't afford a lawyer, that the Magistrate would *probably* appoint one for him . . . ." Rec., vol. II, at 121 (emphasis added).

Thus, contrary to the majority's assertion, the record indicates that Anthon was never informed of his right to have counsel present during questioning, of his right to have counsel appointed if he could not afford one,[1] and of his right to stop questioning at any time. Given Cordova's previous failures to furnish effective *Miranda* advisements and the marked discrepancies between his testimony during the suppression hearing and at trial, Cordova's alleged statement that he "again advised him of his rights" is certainly not enough to satisfy the heavy burden *Miranda* places upon the Government in demonstrating the adequacy of warnings. Moreover, even if we presume the accuracy of Cordova's trial testimony, telling the suspect that counsel "probably" will be appointed if he cannot afford one does not provide the assurance of representation *Miranda* considered essential if both rich and poor are to intelligently deal with the compelling pressures inherent in custodial interrogation. *See Miranda*, 384 U.S. at 467, 473, 86 S.Ct. at 1624, 1627. And being told that counsel probably would be appointed the following day is of little value when, as here, the questioning immediately resumed.

The argument that Anthon waived his rights by failing to request the presence of counsel during Cordova's questioning is untenable. Obviously, the Government cannot demonstrate "that the defendant knowingly and intelligently waived" his rights if he has never been fully informed of them. *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628. In *Miranda* the Court said that "failure to ask for a lawyer does not constitute a waiver. No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given." *Id.* at 470, 86 S.Ct. at 1626.

The concept of voluntary statements is no more applicable to this case than is waiver.

---

1. I do not agree with the majority that Anthon is not objecting to a failure to adequately inform him of his right to appointed counsel prior to the second set of admissions. *See* at 674. While his brief does structure the issues as the majority says, the brief elsewhere states:

> "The agents further admitted that the only addition to the warnings given prior to the second set of statements was to tell the defendant that he would spend the night in jail and that the next day the magistrate would 'probably' appoint counsel for him if he was indigent. Under the cases cited above, these warnings were inadequate and the statements made by the defendant should have been suppressed."

Appellant's Brief at 9.

The majority concludes that Anthon made his statements voluntarily in an effort to trade his cooperation for leniency in punishment. In support it cites the proviso in *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630, that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." More fully, however, that passage in *Miranda* continues:

> "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warning and counsel, but whether he can be interrogated. *There is no requirement that police stop a person who enters a police station and states that he wishes to confess a crime, or a person who calls the police to offer a confession or any other statement he desires to make.* Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

384 U.S. at 478, 86 S.Ct. at 1630 (footnote omitted) (emphasis added). Thus, the reference to voluntary statements relates to spontaneous utterances not induced by questioning or coercion, something very different from Anthon's statements. *See, e. g., Phillips v. Attorney General of California,* 594 F.2d 1288, 1290–91 (9th Cir. 1979); *United States v. Grant,* 549 F.2d 942, 946 (4th Cir.), *cert. denied,* 432 U.S. 908, 97 S.Ct. 2955, 53 L.Ed.2d 1081 (1977); *United States v. Savell,* 546 F.2d 43, 45–46 (5th Cir. 1977).

*Miranda* makes clear that a statement made in response to custodial interrogation may not be deemed voluntarily made unless the suspect has previously been given his *Miranda* rights and has "knowingly and intelligently waived" them. *Id.* 384 U.S. at 475, 86 S.Ct. at 1628. The Court said:

> "We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains *inherently compelling pressures* which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full op-

portunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

*Id.* at 467, 86 S.Ct. at 1624 (emphasis added). In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court reiterated the *Miranda* focus on in-custody interrogation:

> "We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

*Id.* at 300–301, 100 S.Ct. at 1689, 64 L.Ed.2d at 307–08 (footnotes omitted).

Under the standard set forth in *Innis,* it is evident that Anthon's statements regarding the pound deal were made during a custodial interrogation. The portions of the record quoted by the majority so demonstrate. Anthon's admissions were made in response to Agents Cordova's and Drieto's inquiry "if he would be interested in assisting the Albuquerque District Office." At 673. Certainly that is a question "reasonably likely to elicit an incriminating response." *Innis,* 446 U.S. at 302, 100 S.Ct. at 1689, 64 L.Ed.2d at 308. The statement that the deal resulting in his arrest was his heaviest deal was in reply to the direct question "what was the heaviest deal [you have] ever done ...." At 673. Agent Cordova himself testified that Anthon was "questioned" after being fingerprinted. Rec., vol. II, at 57.

The record demonstrates that Anthon was never informed of his right to have counsel present during questioning, of his right to have counsel appointed if he could not afford one, and of his right to stop questioning at any time. The first two

warnings are absolute prerequisites to the use against the accused of statements made during custodial interrogation. As the Supreme Court reaffirmed in *Fare v. Michael C.*, 442 U.S. 707, 717, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979):

> "The rule the Court established in Miranda is clear. In order to be able to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation."

*See United States v. DiGiacomo*, 579 F.2d 1211, 1214 (10th Cir. 1978) (right to appointed counsel may not be excluded from advisement); *United States v. Oliver*, 421 F.2d 1034, 1038 (10th Cir. 1970) (each of the warnings must be given to render testimony admissible). And while there may be no express requirement to warn a suspect of his right to terminate questioning, the failure to do so is "an important factor" to be considered in determining whether the suspect voluntarily waived his *Miranda* rights. *DiGiacomo*, 579 F.2d at 1214.

Because Anthon was never given adequate *Miranda* warnings prior to the incriminatory statements he made during custodial interrogations, the statements should not have been admitted at trial. *See Fare*, 442 U.S. at 717, 99 S.Ct. at 2568. It is for the jury to determine whether there is sufficient proof of guilt to convict without Anthon's statements about the pound deal and the other statements the majority found inadmissible but considered harmless.

Retrial and exclusion of highly probative evidence is a high price to pay for curing what are often called technical violations. But any constitutional violation appears "technical" when it results in the exclusion of evidence demonstrating guilt or in the condonation of conduct our values find abhorrent. Constitutional protections cannot be applied only when we know post-hoc that they are being used to safeguard the virtuous. The strength of constitutional principles depends upon their consistent application, for erosion sets in too easily if we begin tampering with ultimate principles to fit them to the particularities of the individual case.

Whatever its drawbacks,

> "*Miranda*'s holding has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible. This gain in specificity, which benefits the accused and the State alike, has been thought to outweigh the burdens that the decision in *Miranda* imposes on law enforcement agencies and the courts...."

*Fare*, 442 U.S. at 718, 99 S.Ct. at 2568.

I would reverse.