**UNITED STATES of America,
Plaintiff,**

v.

**Dennis GWINN, Defendant.**

**Criminal Action No. 5:98–00164.**

United States District Court,
S.D. West Virginia,
Beckley Division.

March 23, 1999.

Miller Bushong, AUSA, Stephanie Thacker, AUSA, Charleston, WV, for plaintiff.

Mary Lou Newberger, AFPD, Charleston, WV, for defendant.

## MEMORANDUM OPINION

CHAMBERS, District Judge.

### I. Introduction

Before entering into a conditional guilty plea, defendant Dennis Gwinn requested that the Court suppress evidence of two guns, a Winchester 12 gauge shotgun and a Smith & Wesson .38 caliber revolver, found in Mr. Gwinn's home. The 12 gauge shotgun was found underneath Mr. Gwinn's living room couch. The .38 caliber revolver was found in a boot located behind the living room door.

Police officers discovered the first firearm during a warrantless search of Mr. Gwinn's living room and the second firearm when an officer picked up a pair of boots to bring to the barefoot detainee before taking him to jail. The government argued that the firearms should not be suppressed because Dianne Harrah consented to a search of Mr. Gwinn's home. In the alternative, the government argued that both firearms inevitably would have been discovered, that the .38 caliber revolver was acquired through a lawful independent source, and that the .38 caliber revolver was in plain view.

The Court **GRANTED IN PART** and **DENIED IN PART** Mr. Gwinn's motion. The Court determined that it should suppress evidence concerning the 12 gauge shotgun, but not evidence concerning the .38 caliber revolver. The Court concludes that Ms. Harrah did not consent to the search that uncovered the 12 gauge shotgun and that the inevitable discovery doctrine cannot save that search. The Court, however, does conclude that the .38 caliber revolver was seized after properly coming within Trooper Ron Thomas' plain view. This memorandum sets forth findings of fact and conclusions of law in support of the Court's decision.

### II. Background

Defendant Dennis Gwinn is charged with being a felon in possession of two firearms in violation of 18 U.S.C. § 922(g)(1). The incident that led to this charge began with a 911 call from Anna Terry on May 10, 1998. Ms. Terry, who is the mother of Dianne Harrah, told the 911 dispatcher:

[M]y daughter is living up there with a guy named Dennis Gwinn, and she just called me real fast and told me to call the police. . . . And she told me that he's got a gun in there by the door and he told her he was going to kill her.

Ms. Terry also told the 911 dispatcher that Ms. Harrah had a baby with her. As a result, West Virginia State Police Trooper Ron Thomas, Sergeant Scott Moore, and a third police officer were dispatched to the scene.

Trooper Thomas, who arrived at Mr. Gwinn's home first, called for Mr. Gwinn to come out of his trailer. Mr. Gwinn, who was not wearing a shirt or shoes, walked out on his front porch and then to Trooper Thomas' cruiser. Trooper Thomas, who stated that he could "smell alcohol all over" Mr. Gwinn, frisked and handcuffed Mr. Gwinn, then asked him where his wife was. Mr. Gwinn responded that she was his girlfriend, not his wife, and that she was in the trailer. Trooper Thomas handcuffed Mr. Gwinn and placed him in the police cruiser. At about this time, Sergeant Moore and a third police officer arrived. Trooper Thomas and Sergeant Moore left the third police officer with Mr. Gwinn, while they approached Mr. Gwinn's trailer.

### III. Entry into Home

#### A. Findings of Fact

█ Trooper Ron Thomas and Sergeant Scott Moore found the front door to defendant Dennis Gwinn's home open, but the screen door shut. Through the screen door, Trooper Thomas could see Dianne Harrah, Mr. Gwinn's girlfriend, sitting on the couch with her baby. Both were crying. Without knocking or asking for permission, the two police officers entered Mr. Gwinn's home.

Upon entering Mr. Gwinn's home, Trooper Thomas tried to calm Ms. Harrah and the baby. He then began asking Ms. Harrah questions about what had happened. Ms. Harrah voluntarily answered Trooper Thomas' questions. She ex-plained that Mr. Gwinn had gotten a gun and threatened to kill her if she left. She described the gun as a blue revolver. While Trooper Thomas was talking with Ms. Harrah, Sergeant Moore conducted a sweep of the remainder of the house, then returned to the living room. The sweep produced no incriminating evidence.

#### B. Conclusions of Law

The Fourth Amendment permits an un-consented, warrantless entry into some-one's home only if "the police can show that it falls within one of a carefully de-fined set of exceptions" to the warrant requirement, commonly referred to as exi-gent circumstances. *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The govern-ment proposed two exigent circumstances to justify the investigating officers' entry into Mr. Gwinn's home: a concern for pos-sible victims in need of immediate aid and a concern for the safety of those at the alleged crime scene. The Court concludes that the investigating officers properly en-tered Mr. Gwinn's home out of a concern for possible victims in need of immediate aid. The Court also concludes that the sweep, which produced no incriminating evidence, necessarily reached its conclu-sion no later than when Sergeant Moore returned to the living room.

In appropriate situations, police officers may enter a home to look for victims in need of immediate aid or for anyone who might pose a threat of harm to those at the crime scene. *See Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (concern for victims); *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (concern for crime scene safety). Police officers may search a home for victims if "they reasonably be-lieve that a person within is in need of immediate aid." *Mincey*, 437 U.S. at 392, 98 S.Ct. 2408; *see also Sallie v. State of North Carolina*, 587 F.2d 636, 641 (4th Cir.1978). Police officers may search a home for anyone who might pose a threat

of harm to those at the crime scene if the officers have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334, 110 S.Ct. 1093. Importantly, a sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335, 110 S.Ct. 1093. Furthermore, a sweep may take "no longer than is necessary" to dispel the concerns that gave rise to the search. *Id.* at 335–36, 110 S.Ct. 1093.

At the time of his entry into Mr. Gwinn's home, Trooper Thomas saw a crying woman with a crying baby in her arms and knew that he had been sent to the residence because of a report that an individual named Dennis Gwinn was threatening to kill his wife or girlfriend. From this evidence, the Court concludes that Trooper Thomas and Sergeant Moore reasonably entered Mr. Gwinn's home to see if Ms. Harrah, the baby, or anyone else might be in need of immediate aid.

### IV.   Seizure of Shotgun

#### A.   Findings of Fact

■ At about the time Sergeant Scott Moore completed the sweep and returned to the living room, Trooper Ron Thomas asked Dianne Harrah to describe the gun that defendant Dennis Gwinn had pointed at her. Ms. Harrah described the gun as a pistol and said that Mr. Gwinn may have taken it outside. Without asking for Ms. Harrah's consent to search, Sergeant Moore went outside the trailer to look for the gun.

During the time that Sergeant Moore was outside, Trooper Thomas gathered additional information from Ms. Harrah and explained her options to her. As part of his information-gathering, Trooper Thomas asked Ms. Harrah for a copy of her driver's license. Trooper Thomas noted that Ms. Harrah's license did not list her last name as "Gwinn." Trooper Thomas asked Ms. Harrah about this and was told that Mr. Gwinn was her boyfriend, not her husband, but that Mr. Gwinn was the father of her child. Trooper Thomas testified that Ms. Harrah told him that she lived with Mr. Gwinn, but Ms. Harrah denies making that statement.

When Sergeant Moore returned to Mr. Gwinn's living room, he asked Ms. Harrah where Mr. Gwinn was the last time she had seen him. Ms. Harrah stated that Mr. Gwinn was in the living room. Again without asking Ms. Harrah for her consent to search, Sergeant Moore began searching the living room. During the search, Sergeant Moore discovered a Winchester 12 gauge shotgun under the couch. Sergeant Moore asked Ms. Harrah to move from the couch so that he could remove the shotgun and look for the revolver that she had described. Ms. Harrah did as Sergeant Moore requested. The officers seized the shotgun, but did not find the revolver.

#### B.   Conclusions of Law

Police officers, of course, may conduct a search if they have a valid consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In determining whether a valid consent has been given, the Court must consider the totality of all the circumstances. *Id.* at 227, 93 S.Ct. 2041. The government has the burden of proving consent. *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

The government argued that Ms. Harrah had apparent authority to consent to a search of Mr. Gwinn's home and that her cooperation evidenced an implied consent to search. Alternatively, the government argued that the inevitable discovery exception to the exclusionary rule applies. The Court concludes that Ms. Harrah did not give her consent to search and thus does not need to address whether Ms. Harrah had apparent authority to consent. The

Court also concludes that discovery of the shotgun was not inevitable.

### 1. Consent to Search

The U.S. Supreme Court has made it clear that the government cannot prove consent to search "by showing no more than acquiescence to a claim of lawful authority." *Bumper v. State of North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). At the same time, the Fourth Circuit has made it clear that consent may be implied in appropriate circumstances. *See United States v. Williams*, 106 F.3d 1173, 1177–78 (4th Cir. 1997) (finding implied consent to open cooperating witness's mail from relationship with police); *United States v. Smith*, 30 F.3d 568, 571 (4th Cir.1994) (finding implied consent from unlocking car door); *United States v. Wilson*, 895 F.2d 168, 170–72 (4th Cir.1990) (finding implied consent for pat down from nonverbal gesture of raising arms); *United States v. Haynie*, 637 F.2d 227, 229–31 (4th Cir.1980) (finding implied consent from entry into airport x-ray screening process); *United States v. Riley*, 554 F.2d 1282, 1283 (4th Cir.1977) (finding implied consent from fourth class mailing). The Fourth Circuit cases finding implied consent fall into three general categories: cases in which there was a specific request by police officers and a nonverbal affirmative response by an individual (*Smith* and *Wilson*), cases in which an individual took some affirmative act that directly exposed his or her property to inspection (*Haynie* and *Riley*), and a case in which there was a working relationship between police officers and a cooperating individual (*Williams*). This case fits into none of these three categories.

Most importantly, police officers never asked Ms. Harrah for her consent to search Mr. Gwinn's living room for the revolver, and Ms. Harrah did nothing more responsive than submit to questioning and move from the couch after Sergeant Moore observed the shotgun under it. To loosely paraphrase a factually similar Ninth Circuit case: "It is one thing to infer consent from actions responding to a police request. It is quite another to sanction the police [searching] a person's home without stopping ... to ask permission." *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir.1990); *see also United States v. Jaras*, 86 F.3d 383, 390 (5th Cir.1996) (refusing to imply consent from failure to object to search in absence of specific request by police officer); *United States v. Most*, 876 F.2d 191, 199 (D.C.Cir.1989) (same). The Court concludes that Ms. Harrah's mere acquiescence to the search was not enough to constitute implied consent.

### 2. Inevitable Discovery

The inevitable discovery exception to the exclusionary rule applies "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). To carry its burden in this context, the government must prove not only that the police officers had probable cause to search and that a search would have uncovered the shotgun, but also that the police officers would have obtained a search warrant. *United States v. Allen*, 159 F.3d 832, 841–42 (4th Cir. 1998).

The Court cannot conclude that the police officers inevitably would have discovered the shotgun. First, the Court believes that, absent the illegal search, the police officers probably would have discovered the revolver, the gun for which they were searching, before finding the shotgun. Indeed, they did find the revolver before leaving Mr. Gwinn's home and in the precise area where Ms. Harrah said she last had seen Mr. Gwinn with it. The Court seriously doubts that the police officers constitutionally could have or would have continued to search for other guns after finding the gun for which they were searching. Second, the government has

not persuaded the Court that the police officers actually would have obtained a warrant to search Mr. Gwinn's home. Trooper Thomas testified only that it was normal procedure to seek a search warrant in the absence of consent to search, not that he actually would have sought a search warrant in this case. Significantly, when Trooper Thomas entered Mr. Gwinn's home, he did not know that Mr. Gwinn was a convicted felon who could not possess a firearm. In fact, Trooper Thomas testified that he planned to charge Mr. Gwinn with wanton endangerment and domestic assault, not with being a felon in possession of a firearm. Both charges would have been buttressed had the police officers found the revolver, but finding the revolver certainly was not critical to bringing those two charges. Simply put, the evidence presented by the government concerning inevitable discovery is too speculative.

## V. Seizure of Revolver

### A. Findings of Fact

Dianne Harrah and Trooper Ron Thomas told very different stories about what happened after the police officers found the shotgun. Ms. Harrah testified that the police officers continued to search until they found the revolver. Trooper Thomas testified that he and Sergeant Scott Moore left defendant Dennis Gwinn's home to secure the shotgun, then he returned to obtain a shirt and shoes for Mr. Gwinn before taking Mr. Gwinn to jail. The Court found Trooper Thomas' testimony to be more accurate and credible than Ms. Harrah's testimony.

According to Trooper Thomas, he took the seized shotgun and placed it in the trunk of his cruiser before returning to Mr. Gwinn's home to obtain a shirt and

shoes for him.[1] Trooper Thomas took this action of his own initiative, not at Mr. Gwinn's request.[2] Upon entering Mr. Gwinn's home,[3] Trooper Thomas asked Dianne Harrah to get a shirt for Mr. Gwinn and asked where Mr. Gwinn's shoes were located. Ms. Harrah pointed toward the door and said: "His shoes are over there." Trooper Thomas observed two pairs of shoes: tennis shoes, which he incorrectly believed to be Ms. Harrah's, and work boots. As Trooper Thomas picked up one of the boots, he observed that "the boot seemed awful[ly] heavy, and I heard something flop inside of it." Trooper Thomas looked inside of the boot and saw a blue steel revolver. After removing the revolver from the boot, Trooper Thomas asked Ms. Harrah if it was the weapon with which Mr. Gwinn had threatened her. Ms. Harrah answered affirmatively, and Trooper Thomas seized the revolver.

### B. Conclusions of Law

The government argued that the revolver should not be suppressed because it inevitably would have been discovered, it was acquired through a lawful independent source, and it was in plain view. The Court concludes that the revolver properly came into plain view and that the discovery of the revolver was not tainted by the prior illegal search.

#### 1. Plain View Doctrine

The Court concludes that the second search and seizure indeed were proper based on the plain view doctrine. "[T]he plain view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the

---

1. In light of the Court's conclusion that the search that uncovered the shotgun was illegal, the Court finds it unnecessary to address whether the seizure also was illegal.

2. The government elicited no testimony that Mr. Gwinn requested a shirt and shoes.

3. The government elicited no testimony that Trooper Thomas knocked or otherwise asked for permission to reenter Mr. Gwinn's home.

object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir.1997). The Court concludes that Trooper Thomas lawfully reentered Mr. Gwinn's home to obtain a shirt and shoes for him, lawfully searched the boots for a weapon after determining that something might be inside, and properly seized the revolver after it came into plain view.

The difficult question in this case is whether Trooper Thomas' reentry into Mr. Gwinn's home to obtain a shirt and shoes for Mr. Gwinn and his search of Mr. Gwinn's boots were lawful. Numerous courts have addressed situations in which police officers have arrested an individual who was not fully clothed and then entered a home or room to get clothes for the arrestee or to allow the arrestee to get clothes for himself or herself. *See generally* Darrel A. Waugh, Note, *Constitutional Law—Developing Guidelines in Fourth Amendment "Clothing Cases" After United States v. Butler*, 16 W. New Eng.L.Rev. 289 (1994). From those cases, the Court can discern three rules governing the lawfulness of such searches.

■ The first rule is that police officers may not move an arrestee from place to place or move items near an arrestee as a pretext for justifying a search incident to a lawful arrest. *See United States v. Griffith*, 537 F.2d 900, 904 (7th Cir.1976) (unconstitutional to justify search of bag as incident to arrest when bag came within arrestee's grab area only because police ordered arrestee to get dressed); *United States v. Wright*, 577 F.2d 378, 381 (6th Cir.1978) (unconstitutional to search luggage that police moved within arrestee's grab area); *see also United States v. Mason*, 523 F.2d 1122, 1126 (D.C.Cir.1975) ("[A]rresting officers [may not] lead the accused from place to place and use his [or her] presence in each location to justify a 'search incident to the arrest.'"); *United States v. Erwin*, 507 F.2d 937, 939 (5th Cir.1975) ("[Police officers] cannot allow the arrestee freedom of movement, and then later use that freedom to justify an exploratory search of the dwelling."). The Court concludes that the first rule does not apply to this case because Trooper Thomas' reentry into Mr. Gwinn's home was not a pretext for an unlawful search. First of all, Trooper Thomas had little reason to think that he would find the revolver in the living room after Sergeant Moore's illegal search of the living room had failed to uncover the handgun. Second, Trooper Thomas restricted his reentry to the living room area and did nothing more than ask Ms. Harrah for a shirt for Mr. Gwinn and pick up the boots after Ms. Harrah told him where Mr. Gwinn's shoes were located.

■ The second rule is that police officers may enter a home or particular room, either to get clothing for an arrestee or to allow an arrestee to get clothing for himself or herself, if an arrestee asks for clothing or consents to entry. *See, e.g., Mason*, 523 F.2d at 1125–26; *Giacalone v. Lucas*, 445 F.2d 1238, 1245 (6th Cir.1971); *United States v. Frazier*, 304 F.Supp. 467, 473 (D.Md.1969), *aff'd sub nom. United States v. Webster*, 426 F.2d 289 (4th Cir. 1970);[4] *State v. Shaw*, 186 Conn. 45, 438 A.2d 872, 874 (1982); *State v. Johnson*, 306 So.2d 724, 728 (La.1975). The first rule derives significant support from the U.S. Supreme Court's decision in *Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982). In *Chrisman*, the Supreme Court held that "it is not 'unreasonable' under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest." *Id.* at 7, 102 S.Ct. 812. In that case, a minor was arrested for possessing an alcoholic beverage. At the minor's request, the police officer accompanied the

---

4. This case involved the application of search-and-seizure principles as they existed before the U.S. Supreme Court's decision in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

minor to his dormitory room so that he could obtain identification. The Supreme Court concluded that the police officer properly entered the dormitory room and seized marijuana seeds and a marijuana pipe that he saw there. According to the Court, "the officer had a right to remain literally at [the individual's] elbow at all times; nothing in the Fourth Amendment is to the contrary." *Id.* at 6, 102 S.Ct. 812. This Court interprets *Chrisman* to stand for the proposition that police officers generally may go anywhere an arrestee goes to prevent the arrestee from accessing weapons, destroying evidence, or escaping. In other words, where the arrestee leads, police officers are free to follow, and what the arrestee asks for, police officers are free to get. The second rule does not apply to this case because there is no evidence that Mr. Gwinn requested a shirt or shoes.

■ The third rule is that police officers do not need a request for clothing from an arrestee to enter a home or particular room to get clothing for the arrestee or to allow the arrestee to get clothing if exigent circumstances exist. *Cf. United States v. Butler*, 980 F.2d 619, 621 (10th Cir.1992) (arrestee was barefoot and broken glass was on ground in area of arrest);[5] *United States v. Titus*, 445 F.2d 577, 579 (2d Cir.1971) (arrestee was naked); *State v. Griffin*, 336 N.W.2d 519, 524 n. 2 (Minn.1983) (arrestee was wearing socks but no shoes and snow covered ground). Exigent circumstances clearly exist when the defendant is wearing no clothing or insufficient clothing in light of current environmental conditions. The Court, however, cannot say that exigent circumstances existed in this case. The defendant was wearing enough clothing to satisfy standards of public decency, and

the defendant was arrested on May 10, 1998, when it certainly is possible to go outside without a shirt or shoes.[6] Accordingly, the third exception does not apply.

■ Having concluded that this case falls outside each of the three clear-cut rules governing clothing cases, the Court is left to determine whether Trooper Thomas' entry into Mr. Gwinn's home to get a shirt and shoes for him was proper. Some courts would answer this question by saying that the absence of any applicable exception to the warrant requirement automatically invalidates Trooper Thomas' entry. *See, e.g., Butler,* 980 F.2d at 621–22; *United States v. Anthon,* 648 F.2d 669 (10th Cir.1981). Other courts would answer the question by saying that Officer Thomas was free to enter Mr. Gwinn's home to get clothes for him, consistent with the principles underlying the exception to the warrant requirement for searches incident to lawful arrests. *See, e.g., United States v. Di Stefano,* 555 F.2d 1094, 1099–1101 (2d Cir.1977); *Walker v. United States,* 318 A.2d 290, 291 (D.C. 1974).

The Tenth Circuit's decision in *Anthon* provides an example of the first approach. In *Anthon,* the court invalidated the search of a hotel room when the defendant, wearing a bathing suit, was arrested outside of it. Police officers took the defendant back to his hotel room where they questioned him for a period of thirty to forty minutes and allowed him to gather his personal effects. While in the room, the police officers observed drug paraphernalia. The court in *Anthon* began its analysis by concluding that the exception to the warrant requirement for a search incident to a lawful arrest did not apply because the arrest occurred outside the de-

---

5. The Court notes that the dissenting judge in *Butler* disputed the facts as found by the majority, as well as the exigency of the circumstances.

6. The government offered no testimony about weather conditions on May 10, 1998. The

Court notes, however, that Mr. Gwinn did not take time to put on a shirt or shoes before exiting his home and that police officers allowed Mr. Gwinn to sit in the police cruiser for at least twenty minutes without a shirt or shoes.

fendant's hotel room and the search for clothes occurred inside the hotel room. *See Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970) (holding that search incident to lawful arrest outside of house does not justify entry into house). The court then went on to explain that no exigent or exceptional circumstances existed:

> There is no suggestion that anyone consented to the search. The officers were not responding to an emergency. They were not in hot pursuit of a fleeing felon. The goods ultimately seized were not in the process of destruction. Nor were they about to be removed from the jurisdiction.

*Anthon,* 648 F.2d at 675 (internal citations omitted). In summary, the court in *Anthon* held that "entry into the defendant's residence cannot be effected, in the absence of consent or exigent circumstances, solely upon the desire of law enforcement officers to complete the arrestee's wardrobe." *Butler,* 980 F.2d at 621–22 (summarizing *Anthon*'s holding). Under the Tenth Circuit's analysis in *Anthon,* Trooper Thomas' reentry into Mr. Gwinn's home almost certainly would be unconstitutional.

The Second Circuit's decision in *Di Stefano* illustrates the second approach. In *Di Stefano,* the court upheld the seizure of a bank money bag observed while a police officer accompanied an arrestee in her bedroom as she changed clothes. At the time of her arrest, the arrestee was wearing a nightgown and bathrobe. Police officers told her to go to her bedroom and change to street clothing. The court in *Di Stefano* concluded that "[t]he officers had a duty to find clothing for [the arrestee] to wear or to permit [the arrestee] to do so." *Di Stefano,* 555 F.2d at 1101. Under the Second Circuit's analysis in *Di Stefano,* Officer Thomas' reentry into Mr. Gwinn's

home almost certainly would be constitutional.

The Court believes that the court in *Anthon* adopts an inappropriately narrow interpretation of the proper scope of a search incident to a lawful arrest, while the court in *Di Stefano* appears to adopt an inappropriately expansive interpretation of its scope. The Court holds that the proper question should be whether Officer Thomas acted reasonably in reentering Mr. Gwinn's home to get a shirt and shoes for him. To determine whether Officer Thomas acted reasonably, the Court will balance Officer Thomas' justification for entering against Mr. Gwinn's privacy interests.

As the U.S. Supreme Court has pointed out, the Fourth Amendment does not forbid all searches and seizures, only unreasonable ones. *See, e.g., Illinois v. Rodriguez,* 497 U.S. 177, 183, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). The Court believes that a "reasonableness" standard is more appropriate than the heightened "exigent circumstances" standard in this very narrow range of cases. First, the typical "clothing" case does not involve a search as that term commonly is understood.[7] Put simply, the police officer, in deciding to obtain clothes for an arrestee, presumably is acting for the benefit of the arrestee, not for the benefit of law enforcement or others. Second, it is not possible for a neutral and detached magistrate to evaluate the propriety of getting clothes for an arrestee before the police officer makes his or her decision. At the same time, the Court believes that a "reasonableness" standard is better than a standard that requires only a showing of an absence of pretext. First, a "pretext-only" standard fails to take into consideration the arrestee's privacy interests. Second, a "pretext-only" standard is subjective. A police officer with the best of subjective inten-

---

7. By this, the Court means that the police officer is not looking for a person to arrest or evidence to seize. Officer Thomas' entry into Mr. Gwinn's home, of course, does qualify as a search for purposes of the Fourth Amendment because Mr. Gwinn has a "reasonable expectation of privacy" in his home.

tions still may violate someone's constitutional rights.

Having balanced Trooper Thomas' justification for entering Mr. Gwinn's home against Mr. Gwinn's privacy interests, the Court concludes that Trooper Thomas' entry into Mr. Gwinn's home was reasonable, particularly to the extent that Trooper Thomas was looking for shoes for Mr. Gwinn. While Mr. Gwinn may not have *needed* shoes, wearing shoes certainly reduced his risk of injury as he walked from the police cruiser to the jail and while he initially walked around inside the jail. In addition, the absence of a shirt and shoes would raise legitimate hygiene concerns. Against these legitimate concerns was Mr. Gwinn's privacy interest in his home. The Court finds two factors critical in concluding that Trooper Thomas acted reasonably in invading Mr. Gwinn's privacy interest in his home. First, Trooper Thomas had lawfully entered Mr. Gwinn's home earlier. As a result, Mr. Gwinn had a reduced expectation of privacy in the areas of his home where Officer Thomas lawfully had been. Second, Officer Thomas' reentry was carefully circumscribed to minimize the intrusion. Officer Thomas asked Ms. Harrah to obtain a shirt for Mr. Gwinn, and he did not travel beyond the entryway to obtain shoes for Mr. Gwinn. Arguably, Officer Thomas could have asked Ms. Harrah to get shoes for Mr. Gwinn, as well, but the Court is not prepared to say that his decision to select the shoes and pick them up himself was unreasonable.

█ Consistent with the preceding analysis, this Court concludes that the first two prongs of the plain view doctrine have been satisfied. Trooper Thomas lawfully was in Mr. Gwinn's living room where he could see the boots, and Trooper Thomas had a legitimate right of access to the boots. Mr. Gwinn argued in his brief that, even if the first two prongs of the plain view doctrine were satisfied, the government did not prove that the object's incriminating character was immediately apparent. The Court disagrees. Having

picked up the boots to take them to Mr. Gwinn and having felt something heavy and heard something flop inside, Trooper Thomas properly searched the boots under the principles governing searches incident to lawful arrests because the boots, and thus whatever was inside of them, were going be placed within Mr. Gwinn's immediate control. *Cf. Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In fact, Trooper Thomas would have been "derelict in his duty ... if he had not taken the necessary precaution to examine the [boot]." *Mason,* 523 F.2d at 1126. Once Trooper Thomas properly observed the revolver, which matched Ms. Harrah's description of the gun used to threaten her, its incriminating character was readily apparent, and thus its seizure permissible under the plain view doctrine.

### 2. Fruit–of–the–Poisonous–Tree Doctrine

█ The Court furthermore concludes that the fruit-of-the-poisonous-tree doctrine does not apply here. The U.S: Supreme Court has extended the exclusionary rule not only to evidence gathered directly as a result of illegal police conduct, but also to certain indirect evidence that "would not have come to light but for the illegal actions of the police." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The purpose of the so-called fruit-of-the-poisonous-tree doctrine is to ensure that "the prosecution is not ... put in a better position than it would have been in if no illegality had transpired." *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). At the same time, "the prosecution [should] not [be] put in a worse position simply because of some earlier police error or misconduct." *Id.*

The Court concludes that the police officers would have arrested Mr. Gwinn and taken him to jail regardless of whether the officers had found the shotgun under the couch and, in doing so, would have found

the revolver in Mr. Gwinn's boot. The Court therefore would be placing the government in a worse position than it would have been in the absence of police error if the Court suppressed the revolver based solely on the illegality of the first search. The Court bases its conclusion that Mr. Gwinn would have been arrested on evidence that Mr. Gwinn had been handcuffed and placed in the back of the police cruiser before either gun was found; that police officers obtained more than enough information from Ms. Harrah to provide them with probable cause to arrest him for the felonies of wanton endangerment and domestic assault; that police officers read to Mr. Gwinn his *Miranda* rights before questioning him; and that the West Virginia State Police's domestic violence protocol provides that officers "should effect a custodial arrest whenever … there is probable cause to believe that a felony has been committed and evidence exists to satisfy all elements of the crime."

## VI.  Conclusion

For the foregoing reasons, the Court **GRANTED IN PART** and **DENIED IN PART** defendant Dennis Gwinn's motion to suppress. The Court determined that it should suppress evidence concerning the 12 gauge shotgun, but not evidence concerning the .38 caliber revolver.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel and the defendant, the U.S. Attorney's Office, and the U.S. Probation Office.